**Ileen BEAN, Appellant,**

v.

**Wendell George RIDDLE, Respondent.**

**No. 52448.**

Supreme Court of Missouri, Division No. 1.

Jan. 8, 1968.

Motion for Rehearing or to Transfer to Court En Banc Denied Feb. 12, 1968.

James S. Formby, Kansas City, for appellant, Ileen Bean.

E. E. Thompson, Ernest H. Fremont, Jr., Kansas City, for respondent; Popham, Thompson, Popham, Trusty & Conway, Kansas City, of counsel.

HIGGINS, Commissioner.

Action for $25,000 damages for wrongful death. Plaintiff appeals from verdict and judgment for defendant.

The incident out of which this suit arose occurred near midnight, Saturday, August 18, 1962, on Missouri Highway 6 approximately 2.4 miles east of the junction of Missouri Highways 6 and 129. Plaintiff's husband, Leslie Bean, had been a passenger in his own 1953 Oldsmobile driven by Lloyd G. McFarland. Carlos Craig and Stanford Potter were also passengers in the Bean Oldsmobile. The automobile was eastbound between Green City and Greencastle when it apparently ran out of gasoline; it had come over the top of a hill west of the home of Dr. R. D. Smith and had started "spitting and sputtering." The vehicle went east down the hill and had started up the hill toward Dr. Smith's house when it stopped. The driver, McFarland, let it roll back to the south side of the highway where it was parked headed east and as far off the road as possible without being in the ditch. It was about two feet on the black-top pavement.

A 1957 Ford automobile, driven by Hershal W. Bramble westbound on Highway 6 came over the Dr. Smith hill east of the above scene and was "flagged" to a stop by Craig and Potter. Mr. Bramble stopped as far to his right on the north side of the road as he could without being in the ditch. When parked the Bramble Ford was some west of the Bean Oldsmobile. Mr. Bramble did not know if he was clear of the pavement; respondent estimated that the Ford was on the pavement by two or three feet. According to measurement by Sheriff Everett Vannorsdel, the paved portion of the highway was 22 feet in width.

The boys who flagged Mr. Bramble "hollered" they were out of gas and inquired where they might get some. Mr. Bramble told them of a service station operator in Green City and that he would let someone go with him to get the gas. The operator then would bring him back to the scene. The

boys relayed this information to Leslie Bean who then walked from his own car across the road to the Bramble car. Mr. Bean stood facing in a generally northerly direction as he conversed with Mr. Bramble.

While Mr. Bean and Mr. Bramble were talking, respondent came over the hill from the west going east. He was traveling around 50 to 55 miles per hour as he crested the hill. He saw taillights on the Bean car on the south side of the road and headlights on the Bramble car on the north side of the road. It appeared to him as though the automobiles were directly across the road from one another. Mr. Bramble watched respondent's car and said, " 'Boys, watch out! Here comes a car.' Well, it come on up through there, and when it went through, I just felt a kind of a thud hit my car, and I turned around and seen this Bean laying there in the center of the road."

Respondent, when about one hundred feet west of the two parked automobiles, saw Mr. Bean standing talking to Mr. Bramble. Mr. Bean was at that time about two or three feet south of and facing the Bramble car. He had been slowing and continued to slow his car and at the 100-foot distance "didn't see any danger, and there was plenty of room to get through." He "seen no reason to stop (and) continued to drive on through." At a point about thirty to forty feet from the parked cars he glanced at the Bean car to make sure he did not hit it and then glanced back, at which time Bramble's lights (on low beam according to Bramble) blinded him temporarily. He was then a foot and a half south of the center of the road with the Bramble car nine and a half to ten feet to his left. He next saw Mr. Bean "practically agin" the left front fender of his car, in an upright position, just to the south of the center line of the highway, facing in a southeasterly direction. His right leg and thigh were toward his car and the left front fender at the corner of the bumper struck Mr. Bean. Mr. Bean then came down the side of his car and struck the rolled-out ventilator glass and the rear side glass. Mr. Bramble was blinded by respon-

dent's lights and could not tell where respondent's car was in relation to the center line of the highway. He did not know whether Mr. Bean turned around, stepped back, or got closer to his car.

Mr. McFarland sat at the wheel of the Bean car and watched through the rearview mirror as respondent approached the scene. He saw respondent swerve toward the center of the road, and the last place he saw Mr. Bean was at the side of Bramble's car. As respondent went through, he was across the center line and on the north side of the road. After respondent's car passed, he saw Mr. Bean lying face down in the middle of the road.

Stanford Potter did not see any impact between Bean and respondent's car. He last saw Mr. Bean leaning against the Bramble car and afterward saw him about the center of the highway and a little behind the Bramble car. Carlos Craig also placed Mr. Bean at the side of and against the Bramble car when struck by respondent.

Everett Vannorsdel, Sheriff of Sullivan County, arrived at the scene (which he located by reference to Dr. Smith's house) about 12:10 a. m., August 19. He found the body of Leslie Bean almost directly north of the Oldsmobile and in the center of the highway. He found the paint scuffed on the left fender over the headlight of respondent's car. The left vent glass was broken and the molding around the left rear window was bent and had blood on it. There were two streaks of blood on the trunk of the car. He also located a quantity of beer and empty cartons in the Bean car.

Dr. E. W. Simpson, a regularly licensed and practicing osteopathic physician in Milan and Sullivan County coroner, examined the body of Leslie Bean at the scene. He found the body lying in the center of Highway 6, lying with the road, not crosswise, with the head to the east. He ordered the body removed by ambulance to a funeral home in Green City where he examined the body further and formed the opinion that Leslie Bean died from brain damage due to

head injury and possibly chest injuries. He felt also that Mr. Bean had been standing or walking facing north, west, or northwest when struck by the left fender of respondent's car and that, as he passed along the left side of the car, his head struck the vent window. The sheriff's accident report reflected his opinion that the "pedestrian" (Mr. Bean) was "obviously drunk." Dr. Simpson aspirated 10 c.c. of blood from the femoral vein of the body and placed it in a glass container. He gave it to the sheriff who, in turn, gave it to Trooper Plumley of the Missouri State Highway Patrol who began a relay which ultimately put the specimen in the hands of Charles Durham, chemist for the Highway Patrol in Jefferson City. The specimen was marked by a label or wrapper written by Sheriff Vannorsdel: "Leslie Bean Killed Struck By Car Driven by Wendal Riddle Blood Drawn by Dr. R. D. Smith Green City Mo. 8–19–62 at 230 A.M. Request Alcohol Content test made & Results Phoned to Sheriff and then Letter Sent." Mr. Durham described the tests made of the specimen and stated that it showed twenty hundredths of one percent (0.20%) of alcohol calculated on a weight-to-volume basis.

Appellant's first point is that the court erred in overruling her motion to quash and in admitting the testimony of Charles Durham because "A proper foundation for the admission of testimony relating to the results of a chemical blood analysis had not been established (and) There was an offer of proof of such positive evidence of contamination of the hypodermic syringe as to require positive proof of its sterility as a foundation for the admission of Durham's testimony."

The general rule respecting the foundation for admissibility of tests for blood alcohol content in civil cases is stated, 29 Am. Jur.2d, Evidence, § 830, p. 922: " * * * it must be proved, as a foundation for the admissibility of evidence of tests for blood alcohol content, that the blood tested was that of the party or person in question, that the continuous custody of the blood sample has

been accounted for until its analysis for alcoholic content, and that the blood specimen was properly preserved or cared for until the analysis, so that the results of the tests are reliable. But it has been held that in a civil case the foundation laid for the introduction of evidence of a blood analysis need not preclude every possibility of a doubt as to the identity of the specimen or the possibility of a change of condition of the blood. If the routine and procedures of a laboratory are shown by the evidence as having been commonly accepted by the medical profession, and the business of the laboratory is the securing, handling, and analysis of blood specimens, among other types of specimens, those routines and procedures ought to be acceptable to the courts. The fact that the internal workings of a laboratory permit one or more employees to handle a blood specimen and to transport it should not bar the admission into evidence of the results of blood tests, nor should the fact that a blood specimen is something that could conceivably be tampered with make that evidence inadmissible."

■ There is ample evidence in this case to satisfy the requirements of the rule and to show a proper foundation for admission of the results of the blood analysis.

The Sullivan County coroner, Dr. E. W. Simpson, was a witness through deposition in appellant's case. He went to the scene, examined the body of Leslie Bean and determined him to be dead. He ordered the body removed by Mr. Wade and Mr. Kent to their funeral home in Green City. He assisted in removal of the body from the ambulance and before it was undressed Dr. Simpson, at his own request, withdrew a 10 c.c. blood sample from the femoral blood vessel of the body. The specimen "was placed in a bottle—placed in a container for handling." He got the container from the funeral home; it was glass; it could be sealed; and it had nothing in it before the blood was put into it. He had no knowledge of previous use of syringe and container. He gave the sample to Sheriff Vannorsdel to deliver to the highway patrol. He added

no anticoagulant to the specimen. Dr. Simpson used a syringe at the funeral home to aspirate the blood. "It was clean and bright at the time I used it."

Sheriff Vannorsdel saw Dr. Simpson withdraw the blood specimen from the body and he received it from Dr. Simpson in a closed glass container. He took it to Kirksville the following morning and delivered it to Trooper B. P. Plumley in exactly the same condition as he had received it from Dr. Simpson.

Trooper John W. Danklef received a blood specimen from Trooper Plumley near LaPlata around 9:30 p. m., August 21. He relayed the specimen to Jacksonville where, at 10:30 p. m., he gave it unopened to Trooper Roy L. Beal. At that time the specimen contained a label from the Sullivan County sheriff's office. Trooper Plumley apparently died before trial, and Trooper Beal identified by badge number his relay report concerning receipt at Kirksville of a specimen from the Sheriff of Sullivan County. Trooper Beal, after receiving the sample from Trooper Danklef at Jacksonville, delivered it unopened to the Columbia police station at 11:45 to 11:50 p. m., August 21. He recalled the specimen as one taken from Leslie Bean.

Derby Martin, desk sergeant in the Columbia police department, recalled the sample left with him around midnight by a state trooper. He did not open nor look into the package. He knew only that a trooper would leave it there for another to receive.

Trooper T. D. Cameron received a blood sample from Sergeant Martin in Columbia around 12:30 a. m. He took it to patrol headquarters in Jefferson City and accompanied the man on duty when he unlocked the laboratory and deposited the specimen in the refrigerator. He was advised that the sample was to be tested for a sheriff in a northern county.

Charles Durham, the chemist, received the sample in the evening or during the night of August 21. It was in a Skippy Peanut Butter jar, glass, with screw top, and contained a label taped to the jar. He was trained in making blood alcohol tests and, in addition to testing for alcohol, tested the specimen for presence of formaldehyde and acetone, tests which are normally made if the source of the specimen is dead or possibly diabetic. The formaldehyde and acetone tests were negative. The alcohol content was 0.20% weight to volume. The specimen was in liquid form without evidence of coagulation or spoilage and it remained so until ordered destroyed March 29, 1963, by the sheriff. He had on rare occasions performed tests where the aspirating instrument was contaminated with alcohol, in which case the reading would be so far out of line as to indicate unreliability. The same would be true if the instrument was contaminated by formaldehyde. Mr. Durham saw nothing to suggest contamination of either container or syringe. Unless an anticoagulant is added, blood coagulates within hours after extraction. Upon examination by plaintiff he stated that a person whose blood tested 0.20% would definitely be intoxicated.

That the foregoing is a sufficient chain of evidence to serve as a foundation for admission of the chemical analysis made by Mr. Durham is borne out by the criminal law of Missouri. The defense to a manslaughter charge in State v. Kelton, Mo., 299 S.W.2d 493, was that defendant shot her husband after physical abuse by him while he was drinking. The state showed that deceased's blood had a concentration of alcohol of but 0.03 percent. The defendant objected that the specimen had not been sufficiently identified. The chain and foundation was that a physician testified he took the sample and delivered it to a Joplin policeman. The policeman testified he received the sample and sent it by mail to the Missouri State Highway Patrol Laboratory at Jefferson City. The officer in charge testified he received a bottle of blood through the mail, postmarked from Joplin, with accompanying notes from the Joplin police department. The court held that

"while the proof of identity sagged a bit in one or two places, we deem the chain to be complete." 299 S.W.2d 1. c. 496[3]. In State v. Sprout, Mo., 365 S.W.2d 572, blood from defendant's trousers and from a sample taken from defendant's arm were tested and compared. The objection was that the trousers and test result were not admissible because the trousers were not in the same condition as when seized. The court quoted from 32 C.J.S. Evidence § 607, p. 766, " 'It is unnecessary to show an absence of tampering on the part of every person through whose hands the article has passed; as long as the article can be identified it is immaterial in how many or in whose hands it has been.' " 365 S.W.2d 1. c. 575[5]. The chain and foundation in this case compare favorably to those found to satisfy requirements for admission of a test result leading to conviction of murder by strychnine poisoning in State v. Smith, Mo., 222 S.W. 455. A chemist from Springfield testified to what he found in the contents of a human stomach and in a Tanlac bottle delivered to him by the Prosecuting Attorney of Wright County. On July 5, the day following his demise, the victim's stomach was removed (at Astoria) by Dr. Latimer who placed it in a glass jar which was not fastened but had a glass top that "set down in the jar." Part of the contents of the stomach spilled out in the jar. Dr. Latimer delivered the jar to the prosecuting attorney who took it to Hartville where he left it in charge of persons in control of an ice plant. It remained there two days and "it appears from the testimony of the two men in control that it was undisturbed, though it is possible that other persons may have seen it while it was there." The prosecutor next took the jar in his automobile to Mountain Grove. "The jar, packed in ice in a box and covered with an old sack was placed in the front of his car." He parked his car and spent an hour or two trying a case before the justice of the peace. He drove from Mountain Grove to Norwood and remained overnight, leaving the jar in that condition all night. Next day he delivered the jar to the chemist in Springfield. The court answered charges that the substance to be analyzed had not been given the necessary care to make a chemical test of it admissible: "In order to admit testimony showing the result of the analysis it was necessary to satisfy the court of the identity of the stomach examined with that of Hutsell and that it was in the same condition when examined as when removed from his body. It was not necessary that it should have been hermetically sealed so as to be inaccessible to anybody; it was not necessary to show that there was an entire absence of opportunity for anybody to tamper with it; it was only necessary to show the circumstances were such as to establish a reasonable assurance that it was the same and in the same condition. * * * The viscera of the deceased * * * were not preserved with that care which should characterize the conduct of an officer in such a case, and the glass jar * * * was carted around in a careless sort of way; but there was no time when anything occurred to suggest a suspicion that the stomach was molested or that any one who might be interested in tampering with it knew that the prosecuting attorney had the jar in his possession when he drove to Mountain Grove and to Norwood. We think the court did not err in admitting the evidence." 222 S.W. 1. c. 458–459 [5, 6].

The question here does not appear to have been ruled in a civil case in Missouri; however, appellant concedes that "the quantum of proof is different in civil cases," and other jurisdictions have ruled chemical tests admissible in civil cases similar to this case. Woolley v. Hafner's Wagon Wheel, Inc., 22 Ill.2d 413, 176 N.E.2d 757, was a dram shop action by a widow in which plaintiff urged that the trial and appellate courts erred in holding results of a test of blood from decedent's body were inadmissible due to insufficient foundation. An employee of Quad-Cities Pathologists Group took the specimen on the day of the occurrence and placed it in a refrigerator in the laboratory of the Moline, Illinois, Public Hospital after labeling it and making an

entry in the night call book. The specimen was taken next morning by Lantz or Summers, employees of the Group. Lantz analyzed the specimen that day at the Group Laboratory in St. Luke's Hospital in Davenport, Iowa. Identifying entries in the laboratory record were taken from the label on the specimen. Defendant's contention was that the test was properly suppressed because no one person of the Group could testify as to the actual transportation of not only Woolley's blood but any blood specimen and that no records were kept regarding transportation and delivery of the specimen in the organization. It also was shown that Lantz and Summers were the only persons who ever delivered specimens between Moline Public and St. Luke's Hospitals and that there had not been any prior loss or incorrect record entry. The court emphasized that the lower court's holdings refusing the test made plaintiff responsible for the internal procedures of the analyzing laboratory over which she had no control, and in reversing noted: "All available records of a laboratory * * * have been placed in evidence, and every person having any knowledge of material matters about the test has testified. Any discrepancy in their testimony or concerning the adequacy of the records goes to the weight to be accorded the evidence rather than to its admissibility. From an examination of the entire record * * * we think that plaintiff proved by a preponderance of the evidence and by the highest degree of proof available * * * that the blood sample analyzed was taken from decedent and was in an unchanged condition when analyzed. Evidence of the results of the test should therefore have been admitted into evidence." 176 N.E.2d 1. c. 760 [3, 4]. Ritter v. Village of Appleton, 254 Minn. 30, 93 N.W.2d 683, involved an objection that the evidence was insufficient to establish a foundation for admission of expert testimony on alcoholic content of blood taken from a body. An automobile accident on December 31 involved an automobile driven by Hanson who was killed in the collision. A state highway officer, Holbrook, went to the mortuary and requested the coroner to take a blood sample from the body. He saw the coroner take two clean, white bottles for the purpose but did not see the specimen drawn. Next day he received two bottles from the coroner, one labeled "Henry Hanson." He took these to his home until the morning of January 4, and then mailed them to Goodwin Joss Laboratories in Minneapolis, from whom he subsequently received reports respecting alcoholic content. The bottles were not returned. The coroner testified that on the night of the accident an officer called at the mortuary and requested samples from Hanson and one Ritter; that the mortician took the samples; that the bottles were labeled at that time, stored in the refrigerator, and called for later by an officer. The mortician testified that an officer or the coroner requested blood samples from Hanson and Ritter and that either he or the coroner or someone at their direction labeled the bottles. Two clean bottles were used. He said it was not likely that he confused the two samples. The proprietor and chief chemist (also deputy coroner and toxicological chemist for Hennepin County) testified that on January 5 he received by registered mail from Officer Holbrook two vials of blood specimens, labeled "Hanson" and "Ritter," "December 31," and that he made an analysis of them. Upon this foundation the chemist was asked to give his analysis as to ethyl alcohol content and, in reference to Hanson, stated his specimen contained 0.18% alcohol by weight which, in his opinion would be sufficient for obvious symptoms of intoxication. The "Ritter" sample was negative. He stated also that there was no formaldehyde or embalming fluid in the Hanson specimen. The court said, "Based upon all the foregoing, we feel that the trial court did not abuse its discretion in determining that the identification of the two bottles submitted to the laboratories for analysis was sufficient to support the opinion of the chemist as to the alcoholic content found in Hanson's blood." 93 N.W.2d 1. c. 688 [2]. See also Annotation, 21 A.L.R.2d 1216.

In Neblett v. Hunter, 207 Va. 335, 150 S.E.2d 115, plaintiff's decedent was the driver of an automobile involved in a collision. About 9:50 p. m., following the collision at 7:00 p. m., the state medical examiner drew a sample of blood from decedent's body, put the same in a tube furnished by the chief medical examiner's office, corked and labeled it with the name of decedent, time of drawing blood, and his name. He kept the sample overnight and next day placed it on the desk of the state toxicologist for analysis of alcohol content. The toxicologist made the test and found that the blood contained 0.18% alcohol. He described his test as standard and accepted procedure and gave his opinion on effect of such concentration of alcohol upon a person's ability to react. Plaintiff objected to admission of the test result but the court found no error. "The sample of blood analyzed by the State Toxicologist was sufficiently identified as that * * * of Mrs. Neblett. The result of the test was adequately established, and was admissible in connection with the expert opinion * * * as to the effect of alcohol upon the faculties of a person." 150 S.E.2d 1. c. 118–119 [1, 2].

Appellant cites State v. Myers, 351 Mo. 332, 172 S.W.2d 946, where the court was in error in admitting results of a chemical test made of some gloves. The case is not in point because, although "the evidence was sufficient to establish the identity of the gloves tested as those taken from defendant when he was arrested" (it was) "insufficient to show that their condition was the same at both times." 172 S.W.2d 1. c. 949–950 [4]. All the evidence in this case indicates the blood tested to have been in the same condition as when taken from the body of Leslie Bean and the situation is to be distinguished from that in State v. Myers, supra, where the gloves taken from defendant were wet and twisted but the gloves received by the chemist were dry.

Appellant's citations from other jurisdictions are subject to similar distinctions. Dobson v. Industrial Accident Commission,

114 Cal.App.2d 782, 251 P.2d 349, was a workmen's compensation proceeding where the insurer attempted to prove that intoxication was the cause of the employee's accident by a blood alcohol analysis. The objection that no proper foundation had been laid was properly sustained "because there was no proof that the blood sample the doctor analyzed was Dobson's blood." 251 P.2d 1. c. 351. By contrast, the specimen tested by Mr. Durham was sufficiently identified in that it was labeled "Leslie Bean" by Sheriff Vannorsdel who saw it aspirated from the body of Leslie Bean by Dr. Simpson as described by him, and the evidence further shows custody of the specimen while so labeled from the time of withdrawal to test. Apodaca v. Baca, 73 N.Mex. 104, 385 P.2d 963, was an action for injuries in which plaintiff objected to admission of results of a blood test on the ground of lack of proper foundation. It was obviously error to admit the test because "there is a missing link in the chain of evidence between the time that the specimen was mailed by Officer Shaw in Tucumcari on May 23, 1960, and the time that it was received by the Beighley Laboratory in Albuquerque on May 27, 1960. The record shows that the package was addressed by Dr. Gordon to Van Atta Laboratory in Albuquerque, but, as hereinbefore pointed out, when, how, by whom and in what manner or condition the blood specimen was received by Van Atta Laboratory, and how, in what manner and by whom it was delivered to Beighley's Laboratory, is not shown by the evidence." 385 P.2d 1. c. 966 [2]. No such gaps appear in the chain shown by evidence here which follows the blood of Leslie Bean from aspiration from his body to the test made by Mr. Durham. In Robinson v. Life & Casualty Ins. Co. of Tenn., 255 N.C. 669, 122 S.E.2d 801, refusal of the blood analysis was obviously proper because "there is no evidence tending to show who took the sample of blood from the body * * *, or as to whether or not it was taken before or after embalming fluid had been injected into his body. Likewise, there was no evidence as to the manner in which the blood was han-

dled after it was taken, if actually taken, from the body of the insured." 122 S.E.2d l. c. 804 [4]. Such omissions are adequately covered in the chain from Leslie Bean to Charles Durham in this case. . Benton v. Pellum, 232 S.C. 26, 100 S.E.2d 534, is another "missing link" case which is not in point because there is sufficient evidence as demonstrated to follow the sample of Leslie Bean's blood from aspiration to test. Appellant also cites 2 Am.Jur., Proof of Facts, Blood Tests, Proof 2, Concentration of Alcohol in Blood, pp. 599–606, suggesting questions as to disposition of specimen. This, too, is lacking in point because there is no attempt to present the specimen in evidence and its destruction is not in question.

■■ Appellant emphasizes the notation on the label affixed to the blood specimen by Sheriff Vannorsdel to the effect that the blood was drawn by Dr. R. D. Smith rather than Dr. E. W. Simpson as all the other evidence shows. There was ample evidence upon which to find that the blood was drawn by Dr. Simpson and upon which the jury could resolve the discrepancy between that and the name of Dr. Smith on the label. In particular, as evidence explaining such error, it is noted that Sheriff Vannorsdel, as well as others present, located the scene in reference to the house of Dr. R. D. Smith and the "Smith Hill." Appellant argues similarly in respect to the effect on the specimen of failure, if so, to add an anticoagulant. Any discrepancy in this matter would, as in the discrepancy between Dr. Smith and Dr. Simpson as the aspirator of the specimen, go to the weight and credibility of the evidence and be for the jury to resolve. Woolley v. Hafner's Wagon Wheel, Inc., supra.

Appellant complains in Point II of the court's refusal of certain rebuttal evidence tendered by appellant on matters "first introduced * * * by respondent."

■ The first such complaint is stated: "Appellant * * * (at the close of all the evidence) offered testimony from the deposition of Erman Alonzo Riddle, father of the defendant in rebuttal to respondent's testimony that he had never at any time crossed over the center line of the road and had driven on the wrong side thereof and that at the time of the fatal accident he was on his own right side of the road and the deceased Leslie Bean was south of the center line of the road. Respondent objected for the reason that appellant had previously taken Mr. Erman Alonzo Riddle's deposition and contended on that basis that the plaintiff had him available by means of his deposition at the time of the case in chief and further objected that the testimony would be cumulative and not proper rebuttal testimony." Appellant charges the court erred in sustaining this objection on the proposition, 88 C.J.S. Trial § 101, pp. 212–213: "Either party is entitled to introduce evidence to rebut that of his adversary, and for this purpose any competent evidence to explain, repel, counteract, or disprove the adversary's proof is admissible, although it tends to support his case in chief. The fact that it was not then introduced does not make it discretionary with the trial court subsequently to exclude it."

The above rule continues, 88 C.J.S., supra, p. 214: "Although the court may, in its discretion, allow it, evidence in rebuttal which is merely cumulative to that offered in chief is not generally admissible." Appellant concedes that "the discovery deposition of Erman Alonzo Riddle was available to both parties during the trial" and that "it is true that the testimony offered in rebuttal did tend to support appellant's case in chief and was somewhat cumulative in nature, and on that basis might be held to be a matter within the discretion of the trial court, nevertheless, the refusal * * * was an abuse of * * * discretion * *."

■ All the witnesses in plaintiff's case who were able to testify on the subject placed respondent on the north side of the center line or wrong side for him at the

time his automobile struck Leslie Bean; and it appears that if Erman Alonzo Riddle had testified either in plaintiff's case in chief or in rebuttal that he would have placed the car driven by his son, respondent Wendell George Riddle, on the north or wrong side of the road, contrary to the son who gave the only testimony that he was at all times south of the center line of the road as he drove east through the scene. Such testimony obviously would have been admissible in plaintiff's case in chief. Under these circumstances, the general rule, 88 C.J.S. Trial § 102, p. 215, is applicable: "One cannot, as a matter of right, offer in rebuttal evidence which was proper or should have been introduced in chief, even though it tends to contradict the adverse party's evidence, and, while the court may in its discretion admit in rebuttal evidence which more properly should have been introduced in chief, it may, in its discretion, and generally should, decline to permit either party to introduce evidence in support of his case in chief on rebuttal, * * *." See Peters v. Dodd, Mo., 328 S.W.2d 603, 610 [9]: "A party cannot, as a matter of right, offer in rebuttal evidence which would have been admissible had it been offered in the case in chief, even though it tends to rebut or contradict the opposite party's evidence."

■ The remainder of appellant's complaint under the point appears to go to the court's refusal of the offer of the deposition of Karl C. Kent and testimony of Dr. Lappi as claimed rebuttal respecting the blood test. Appellant's offer was made at the close of all the evidence and is stated: " * * * would like to offer in rebuttal to the defendant's case the deposition of Karl C. Kent, mortician at Green City, Missouri, who, if permitted, will testify that the syringe at his establishment was cleansed with a substance known as hydrol tissue builder solvent, that the method of cleansing is simply by taking the needle of the instrument and placing it in solvent and moving the plunger up and down and

then setting it aside. * * * also the testimony of Dr. Lappi, a pathologist and chemist, who has examined two samples of hydrol tissue builder solvent, one being a portion of a bottle obtained * * * at the Kent Funeral Home * * * and another coming from a fresh, unopened bottle of hydrol tissue building solvent. His testimony will be that the composition, chemically, of hydrol tissue builder solvent is ninety-nine per cent methyl alcohol. This is offered in rebuttal to the evidence introduced by the defendant that there was an alcoholic content in the blood sample which he (Mr. Durham) examined and which was allegedly taken from the body of Leslie Bean."

■ Assuming this offer to be sufficiently "specific and definite," Rutledge v. Baldi, Mo., 392 S.W.2d 244, 248 [3–5], its denial is well within the rules that "The trial court has considerable discretion in admitting and excluding testimony in rebuttal which was available and should have been offered in the presentation of the case in chief," Rutledge v. Baldi, supra, 1. c. 248 [6, 7], and that "when evidence is thus offered out of order the trial court has a judicial discretion to admit or exclude it," Peters v. Dodd, supra, 328 S.W.2d 1. c. 610 [10].

Appellant, in the colloquy following the offer, stated that the offer "will in no way contradict the testimony of Dr. Simpson," and that the evidence of Mr. Durham, the chemist, "is what I am contradicting." The evidence of Mr. Durham was that of results from his test of a blood specimen from the body of plaintiff's deceased showing 0.20% concentration of alcohol in decedent's blood and his opinion that such concentration indicated deceased's intoxication. Appellant's offer, she appears to contend, would tend to invalidate the test and thus discredit the result and opinion.

Plaintiff undertook in her case in chief to prove that her decedent, Leslie Bean, was not under the influence of intoxicating liquor in that she presented the evidence

through Lloyd McFarland that Bean "wasn't staggering or anything like that"; that, according to Peggy Sue Bean, decedent's daughter, there was no indication he had been drinking at 5:30 o'clock prior to the accident; that Carlos Lee Craig, who was with decedent from 8:00 p. m. until the accident, "never seen him take a drink." In addition all testimony from Dr. Simpson's deposition was in plaintiff's case in chief and such included the taking of the blood sample for alcoholic content analysis and the manner in which it was taken by Dr. Simpson including instruments and vessels used and their condition. It is obvious from these excerpts that plaintiff elected in chief to adduce evidence touching on her decedent's sobriety or intoxication, all of which would have been admissible and cumulative of other evidence in chief, Peters v. Dodd, supra, and, after having partially pursued the subject, could not reserve a portion such as her evidence tending to show contamination, for rebuttal as a matter of right. See 88 C.J.S. supra, p. 214: "One may, if allowed in the discretion of the court, introduce rebuttal evidence on his case in chief, as discussed supra, § 99. However, if this is done, the party is not entitled as a matter of right to introduce further evidence to the same point in rebuttal of his adversaries' case. Having elected to rebut it in advance, he should then put in all his evidence on that point. Hence, the court, in its discretion, may properly refuse to admit further evidence to the same point in rebuttal, and ordinarily it should do so."

█ The bulk of appellant's remaining argument under this point in summary is that the trial court "should not be permitted to advise appellant that appellant could offer any witnesses to refute that testimony (Mr. Durham's), lead appellant to rely upon that statement, base rulings to appellant's objections to respondent's evidence on the assumption that appellant would introduce such testimony and then in the guise of discretion refuse to admit the evidence which it had previously advised appellant it would permit." This argument apparently stems from a statement made by the court upon overruling appellant's pretrial motion to quash evidence pertaining to a chemical blood alcohol analysis: "The admissibility of the evidence that is attacked in this motion is material to the issues in this case. The various issues raised by you, Mr. Formby, are matters for the jury to pass upon as to the credibility of the various witnesses, and you have a right, of course, to offer any evidence that you desire in your case and you mentioned that you have various witnesses here. You certainly have a right to offer any witnesses to refute any testimony relating to the blood sample, and the manner in which it was obtained. Those are matters for the jury to pass on as to the credibility of the various witnesses."

There is nothing in the court's statement inconsistent with the authorities cited and quoted supporting the court's exercise of discretion in this case. The court gave appellant ample opportunity to present her case and was not obligated to receive in rebuttal that which was admissible in chief and therefore properly a part of her case in chief.

Finally, error is charged to the court's refusal to permit appellant to comment on respondent's failure to call his father, a passenger in respondent's car, as a witness. The court's refusal of such comment was on the ground that the witness was equally available to both parties.

█ "[I]t is well settled that the failure of a party having knowledge of the facts and circumstances vitally affecting the issues on trial to testify in his own behalf, or to call other witnesses within his power who have knowledge of such facts and circumstances, raises a strong presumption that such testimony would have been unfavorable and damaging to the party who fails to proffer the same. * * * Such failure may be commented upon in

argument." Block v. Rackers, Mo., 256 S.W.2d 760, 764 [5–8]. See also Duboise v. Railway Express Agency, Inc., Mo., 409 S.W.2d 108. This rule is limited in that " 'no inference may be drawn, and no unfavorable comment made by counsel on account of non-production of witnesses whose evidence is equally available,' " and the parent of a party would not be equally available to the adverse party. Spica v. McDonald, Mo., 334 S.W.2d 365, 370 [4]. See also Williams v. Ricklemann, Mo., 292 S.W.2d 276 (defendant's wife not equally available to plaintiff). However, in this case the deposition of Erman Riddle, respondent's father, was taken by plaintiff and plaintiff was fully advised of the nature and extent of his testimony as shown by her offer to read certain items from it, the refusal of which was part of the error charged in Point II, supra.. In that posture, plaintiff's knowledge in respect to the testimony Erman Riddle could give was equal to that of defendant, and Lix v. Gastian, Mo.App., 287 S.W.2d 354, is directly in point. In that action plaintiff sought damages for injury to his automobile resulting from a collision with defendant in which the automobile was being operated by plaintiff's stepson. There were two trials of the case, the stepson testifying in the first but not in the second. Plaintiff asserted error on appeal after the second trial in respect to defendant commenting on plaintiff's failure to call his stepson as a witness. The argument was held erroneous because a transcript of the stepson's testimony in the first trial was on file and the witness, although related to the adverse party, was thus equally available. " * * * Such an argument was improper. The transcript of Adams' testimony could have been 'used in the same manner and with like effect as if such testimony had been preserved in a deposition in said cause,' Section 492.410 RSMo 1949, V.A.M.S., and was equally available to both parties. No inference may be drawn and no unfavorable comment made in argument on account of the non-production of witnesses whose evidence is equally available to both parties." 287 S. W.2d l. c. 357 [4–7].

Judgment affirmed.

HOUSER, C., not sitting.

WELBORN, C., concurs.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.