VICTORSON and wife, Respondents, v. MILWAUKEE & SUBURBAN TRANSPORT CORPORATION, Appellant.

*No. 30 (1974). Submitted September 30, 1975.—Decided October 28, 1975.*

(Also reported in 234 N. W. 2d 332.)

338

342

For the appellant the cause was submitted on the brief of *Kasdorf, Henderson, Dall, Lewis & Swietlik,* attorneys, and *John M. Swietlik* of counsel, all of Milwaukee.

For the respondents the cause was submitted on the brief of *Mulcahy & Wherry, S. C.,* attorneys, and *Michael R. Wherry* and *Ronald J. Rutlin* of counsel, all of Milwaukee.

HANLEY, J. The following issues are presented on appeal:

1. Was there credible evidence upon which the jury could find the defendant causally negligent?

2. Did the trial court err in its instructions to the jury, and was any such error prejudicial?

3. Was it error for the trial court to allow plaintiff to cross-examine and thus impeach his own witness, and was such error prejudicial?

4. Should the plaintiff wife's damages for loss of consortium and for services rendered be reduced by the husband's contributory negligence?

5. Was it proper for the trial court to disallow plaintiff's damages for loss of future earning capacity?

*Sufficiency of evidence.*

The trial court submitted the following special verdict question in regard to the negligence of the defendant:

"At and immediately prior to the accident on October 23, 1971, was the defendant negligent with respect to the manner in which its bus was operated or equipped?"

Before reviewing the evidence concerning the alleged negligence, it would be appropriate to review the development of the law concerning common carriers. Wisconsin Jury Instructions—Civil, Part I, 1025, aptly sums up the general standard of care:

"Negligence has been defined. as a failure to exercise ordinary care.

"In this case [the defendant] is a common carrier. In order for it to comply with the standard of care applicable to a carrier, it is required to exercise the highest degree of care for the safety of its passengers that men of reasonable vigilance and foresight ordinarily exercise *in view of the mode and character of the conveyance adopted and consistent* with the practical conduct of such business under the same or similar circumstances.

"While the carrier is chargeable with the highest degree of care for the safety of its passengers as heretofore defined, such carrier is not an insurer of the safety of its passengers." *Bradford v. Milwaukee & Suburban Transport Co.* (1964), 25 Wis. 2d 161, 166, 130 N. W. 2d 282.

In explaining that the "highest care" language does not create a special area within the field of negligence law, this court in *Ormond v. Wisconsin Power & Light Co.* (1927), 194 Wis. 305, 308, 216 N. W. 489, noted:

"It is to be tested by the same rules which are applied to ordinary care. In fact, the care which the rule prevailing here imposes upon common carriers falls within the class of ordinary care, and their failure to observe that care amounts to ordinary negligence under our classification of negligence. To be true, the care exacted of the common carrier is a high degree of care. . . . It is but the application of the doctrine that 'the standard of duty should be according to the consequences that may ensue from carelessness.' " (Citation omitted.)

Since the operation of a common carrier involves greater risks and potentially more serious harm through negligent conduct than would the operation of freight vehicles or individual modes of transport, recognition must be given to the circumstances in which the ordinarily prudent person is operating.

Recent cases have articulated specific aspects of the carrier's duty. In a statement that was quite restrictive, undoubtedly because the factual occurrence required no elaboration on the complete nature of the duty to an alighting passenger, responsibility was viewed to cease when the passenger alights at a safe location. *O'Connor v. Larrabee* (1954), 267 Wis. 185, 64 N. W. 2d 815. This narrow view was repudiated by *Williams v. Milwaukee & Suburban Transport Corp.* (1967), 37 Wis. 2d 402, 406, 155 N. W. 2d 100. *Williams* repeated that a carrier:

". . . not only has a duty to provide a place of safety to alight, but also to refrain from any conduct in the operation of [the] vehicle which would convert this place of safety into one of potential hazard. . . ."

The plaintiff in *Williams* was a young mother who alighted from the side door of a bus to a small space before banked up snow. Burdened by packages, she attempted to induce her three-year-old daughter to walk to a nearby path to the sidewalk; failing that, she bent down to lift the girl over the snowbank. The bus started up, grazing her and causing the child to fall beneath the wheels. Liability was imposed. In so finding, this court gave reference without citation to this duty as applicable in streetcar cases, although stated as a reasonable opportunity to get beyond the zone of danger (*see Hadrian v. Milwaukee Electric Railway & Transport Co.* (1942), 241 Wis. 122, 128, 1 N. W. 2d 755, 3 N. W. 2d 700, 5 N. W. 2d 765) and as similarly applicable in motor bus cases. *Williams, supra,* at 406.

*Williams* was followed by *Furrer v. Milwaukee & Sub-urban Transport Corp.* (1968), 40 Wis. 2d 560, 162 N. W. 2d 537. A grandmother, her heavy-set teen-age grand-daughter and her two-year-old granddaughter all alighted from the side door of a bus into a space enclosed by snowbanks. While passing the infant to the teen-ager who then walked to a nearby path, the grandmother's coat became caught in the closing doors of the bus. She was dragged as the bus moved forward. Both the grand-mother and the bus company were found negligent, but a new trial was ordered because of a failure to instruct on the *Williams* duty of refraining from actions that threaten passengers within the originally safe place of departure.

A situation allegedly controlled by *Williams* was raised in *Gustavson v. Milwaukee & Suburban Transport Corp.* (1971), 52 Wis. 2d 510, 191 N. W. 2d 39. The jury found the plaintiff to be more negligent than the bus company, and in upholding that verdict this court found that there was credible evidence in support of the apportionment. This was found to be so even though the plaintiff could propose a version of the conflicting testimony that would reveal no negligence on his part. *Id.* at 514. Interpreting the testimony in light of the verdict, the court found that the plaintiff alighted from the side door into a clear, safe place and, rather than wait for the bus to leave or rather than walk to a nearby path, the plaintiff at-tempted to walk through a snowdrift; as a result, he slipped back into the path of the moving bus. A sig-nificant portion of negligence, however, was still al-lotted to the defendant carrier.

On appeal, the defendant carrier asserts a version of the facts that does have support in the testimony, just as in *Gustavson;* similarly, if the jury agreed with such facts, the propriety of the verdict would be difficult to affirm. Other testimony was produced, however, that either directly controverted such "facts" or at least

raised doubts as to the proponent's recollection of the occurrence. In light of the standard of review on appeal:

" '. . . (1) a jury verdict will not be upset if there is any credible evidence which under any reasonable view fairly admits of an inference supporting the findings, (2) this is particularly true when the verdict has the blessing of the trial court, and (3) the evidence is to be viewed in the light most favorable to the verdict.' " *Capello v. Janeczko* (1970), 47 Wis. 2d 76, 81, 176 N. W. 2d 395.

The carrier's arguments lose as much efficacy here as did the plaintiff passenger in *Gustavson.*

Great reliance is placed on testimony that indicates two passengers alighted after Victorson by the same rear door at the same stop and that it took such passengers approximately "fifteen seconds" to clear the door because they were "fooling around." Such testimony came from the read-in deposition of the bus driver which also included his repudiation of prior police reports that recorded his assertion that the rowdy passengers were at the front door. Since the reporting police officers testified, and the driver did not, the credibility of such repudiation was seriously in doubt. Another bus passenger testified that the two passengers exited from the side rear door: Even though she was seated behind the driver and facing the front door, however, she did not hear the buzzer signal to stop and did not see a passenger alight from the front door (as claimed by the driver). She admitted that she may have dozed off on the trip. The credibility and clarity of her recollection are difficult to glean from the record and must be left to the jury. Victorson's deposition contained the statement that he wasn't sure if anyone else exited at the stop and that he conceded that the bus might have been stopped fifteen seconds, although he "didn't think" it was that long.

Without engaging in further analysis of the conflicts in testimony, the jury verdict can be supported even under a factual situation that embraces the testimony favorable to the defendant. Victorson's testimony was ambiguous as to the cause of his fall and is so speculative as to raise the belief that the fall was not caused by the carrier: no defect in the steps was shown, and it is admitted that the bus did not move. The main basis for the verdict lies in the claim that the safe place of exit became dangerous by the movement of the vehicle.

Emphasizing this theory, the carrier has sought to escape liability by reference to some explanatory language in the per curiam opinion of *Gossen v. Milwaukee & Suburban Transport Corp.* (1973), 58 Wis. 2d 736, 207 N. W. 2d 670. That language, interpreting the previous *Williams* and *Furrer Cases,* is apparently construed by the defendant to mean that there is no carrier negligence if the plaintiff performs any material act that increases the risk that becomes imminent upon the movement of the bus. The fall of Victorson here is similar to the slip in *Gustavson* and the disorganized delays in *Williams* and *Furrer* in that such negligent actions kept or brought the injured parties back to the zone of danger created by the vehicle's movement through the originally safe place. In each case the jury analyzed the character of the plaintiff's movements in allocating negligence to him and to the moving carrier. The illustrative language in *Gossen* should not be read beyond its function of analyzing the plaintiff's action totally unrelated to the vehicle or area of departure.

It may be asserted that the independent act of Victorson falling while alighting, whether from a dizzy spell, arthritic inflexibility or otherwise, seems identical to *Gustavson* where such act made the plaintiff more negligent than the carrier. The less negligent plaintiffs in *Williams* and *Furrer* were injured because the bus nudged or hooked them by its movement, while they

remained in the originally safe area of exit. A distinction can be found in that *Gustavson* cleared the zone of danger and fell into the vehicle's path after any duty toward him existed. In the case at bar, Victorson never moved out of the danger zone before movement started.

That the defendant could be more negligent than Victorson may be seen in a full consideration of the duty incumbent upon it. Counsel for plaintiff, with permission of the trial court, introduced testimony as to the availability of mirrors that would allow the carrier driver to view the zone of danger.

Initially, a distinction must be made between the availability of such a theory and its method of proof. The testimony of a representative of the bus manufacturer included the fact that a set of interior mirrors for viewing the stepwell was standard equipment for the vehicle. Other testimony established that the industry custom was not to utilize such mirrors if an interlock (as here) system is used: since the mirrors were used only for the driver to know when passengers desired to exist by the driver-controlled rear door, and since the interlock system performed the opening and closing function automatically, the mirrors seemed surplusage. Victorson claims that retention of the inexpensive interior mirrors would have provided a means for the driver to view plaintiff's fall. Here the efficacy of such mirrors would be good since the testimony established that the corner of Green Bay and Concordia was well-lighted. The jury could accept plaintiff's assertion.

Of more importance is the admittedly optional right-exterior mirror. The sole testimony on industry custom indicated that such were not used in urban traffic: the implication is clear that they were most often used for highway travel where lane changes would be involved. The manufacturer's representative noted that they were also useful to observe inside traffic (bicycles) that might be jeopardized by a turn; further, that the mirror

would allow a view of whatever the driver wished to see along the side.

Strenuous objection was raised to the theory and to the instructions regarding these mirrors, mainly on the lack of their usage for the safety purpose suggested by the plaintiff. This argument stems from the *Ormond Case*. In announcing that the "highest duty" standard was specifically a standard of ordinary care, the court stated the typical duty standard (p. 308) :

"Whether the conduct of the common carrier in a given particular accords with its legal duty in the premises is to be tested by comparing its conduct with that generally exercised by those engaged in the same business under the same or similar circumstances. . . ."

This defense from allegations of negligence frequently appears in the products liability area, and in such instances this court has stated:

"The fact that the custom of manufacturers generally was followed is evidence of due care, but it does not establish its exercise as a matter of law. Obviously, manufacturers cannot, by concurring in a careless or dangerous method of manufacture, establish their own standard of care." *Marsh Wood Products Co. v. Babcock & Wilcox Co.* (1932), 207 Wis. 209, 219, 240 N. W. 392.

In addition, Wisconsin Jury Instruction—Civil, Part I, 1019, most accurately states the current view of industry custom:

"Evidence has been received as to the [practice in the industry]. This evidence will be weighed and examined by you as it may bear upon whether the conduct of the defendant measures up to the standard of ordinary care. This evidence of practice is not conclusive as to what meets the required standard for ordinary care or reasonable safety. What is generally done by men engaged in a similar activity has some bearing on what an ordinarily prudent person would do under the same or like circumstances. Custom cannot overcome the require-

ment of reasonable safety and ordinary care. A practice which is obviously unreasonable and dangerous cannot serve to excuse a person from responsibility for carelessness. On the other hand, a custom or practice which has enjoyed a good safety record under similar conditions could aid you in determining whether or not defendant was negligent."

*Marsh Wood, supra,* was an example of expert testimony demonstrating the risk inherent in an industry custom. The lack of due care inherent in other customary practices certainly may be observed by the common man without benefit of experts. In light of the verdict here, such an observation surely took place. The failure of the defendant to equip and operate its vehicles with a means to efficiently view the placement and circumstances of passengers who have exited via the rear door exit was undoubtedly found to be negligence.

The availability of the mirrors was shown. Their utility and purpose was controverted, but the jury was free to draw their own conclusion as to whether a reasonably vigilant person, exercising the highest degree of care for his passengers, would have used them or similar arrangements to view the alighting passengers. Can it be said that the finding of negligence under the circumstances was unjustified? We think it cannot.

After reviewing the recent similar decisions in *Williams, Furrer* and *Gustavson,* it might not be amiss to note that the installation of exterior mirrors would certainly minimize the problems involved in the alighting process and be more effective than attempts to fashion complex rules for carrier liability by judicial decision. Since this is the fourth case involving the same defendant and arising out of difficulties encountered by its rear-alighting passengers who ultimately are injured by the vehicle's movement, it would not be unreasonable to contend that an efficient means to view the exit area

is called for in compliance with the duty of care for such passengers.

A duty to observe that alighting passengers have cleared the zone of danger created by further movements of the bus does not impose a duty inconsistent with the responsibility of forward view for traffic purposes; rather, it comes into play and is completed before that duty arises. Additionally, the duty is to alighting passengers, and does not command continual rear view to observe pedestrians or, as perhaps in the case of *Gustavson,* passengers who have cleared the danger zone but who re-enter through their own subsequent independent acts of negligence.

*Instructions to jury.*

Error is alleged by instructions and testimony regarding company rules relating to the carrier's discharge of passengers at a safe place, as near to the curb as possible. A failure to pull directly adjacent to the curb is, of course, not negligence: only a safe place is required. *Burke v. Milwaukee & Suburban Transport Corp.* (1968), 39 Wis. 2d 682, 159 N. W. 2d 700; *Reque v. Milwaukee & Suburban Transport Corp.* (1959), 7 Wis. 2d 111, 95 N. W. 2d 752, 97 N. W. 2d 182. The admission of the company practice was thus irrelevant. The jury instructions involved both explained the duty and demonstrated that it had been met. This contradictory position may have created confusion but it undoubtedly cured any error arising from the initial consideration of this issue.

The defendant requested that the court instruct that the defendant had no duty to equip its buses with the aforementioned mirrors. Since this theory was based on a review of the facts and the application of the too-

restrictive statement in *Werlein v. Milwaukee Electric Railway & Transport Co.* (1954), 267 Wis. 392, 66 N. W. 2d 185, the trial court was correct in refusing this request. In addition, the court gave instructions patterned after *Werlein* that would have allowed the jury to reach the same conclusion demanded by the carrier. Additional instructions, based on a restatement of the duty of carriers regarding new equipment as contained in 14 Am. Jur. 2d, *Carriers,* p. 452, sec. 1029, also were given.

Defendant complains of the alleged refusal of the trial court to instruct that the bus did in fact stop at a reasonably safe place and that the defendant cannot be found negligent in this respect; further, that the defendant had no duty to stop its bus so that the plaintiff would be able to alight directly from the bus onto the curb or sidewalk area. The instruction given included:

"The defendant bus company as a common carrier has a duty to discharge a passenger in a place of safety. . . . Although the practice is to stop at the curb, there is nothing in the law requiring the bus driver to stop his bus adjacent to the curb, nor is there any evidence that the roadway adjacent to the curb was a dangerous condition. If you find that the bus driver failed to discharge the male plaintiff in a place of safety, you must find the defendant negligent."

This instruction satisfied the latter request of defendant; as to the former, the trial court could have found as a matter of law and so instructed the jury that the bus stopped in a safe place, but there was no prejudicial error here in stating the same conclusion in a negative manner.

A disputed instruction concerning operation of the vehicle so as to convert a place of safety into one of potential hazard was not error for the objection is based on a misconstruction of the law fostered by *Gossens,*

*supra,* that the movement of the bus must first cause the plaintiff to fall.

The trial court also gave the missing witness instruction. Defendant did not produce for testimony its employee bus driver allegedly involved in this accident; his pretrial adverse deposition had been read into the record by the plaintiff. In *Ballard v. Lumbermens Mut. Casualty Co.* (1967), 33 Wis. 2d 601, 148 N. W. 2d 65, this court provided (pp. 615, 616) :

"The requirements of the absent material witness instruction should be narrowly construed to be applicable only to those cases where the failure to call a witness leads to a reasonable conclusion that the party is unwilling to allow the jury to have the full truth."

The defendant company explained to the jury and reiterates on appeal that the driver "had only one story to tell and he told it." Commentary on the law of evidence indicates that no inference should arise when the testimony would be simply cumulative, 1 Jones, *Evidence* (4th ed. 1938), p. 52, sec. 21; 2 Wigmore, *Evidence* (3d ed. 1940), sec. 287 (b), but such cumulation is apparently measured as separate independent witnesses testifying to the same fact. The read-in deposition is offered as compliance with the witness appearance that would bar any adverse inference. Some cases indicate that if the party seeking to utilize the adverse inference has in fact obtained a deposition of the missing witness, then the instruction and comment on the other party's failure to call him should not be allowed. *Atlantic Coast Line R. R. Co. v. Larisey* (1959), 269 Ala. 203, 112 So. 2d 203; *Bean v. Riddle* (Mo. 1968), 423 S. W. 2d 709. The usual rationale cited is that the witness is thus equally available to both parties, *Bean, supra,* at 721, and that the deposition has its trial uses. At the least, the party has examined the witness whom he ordinarily could not interview and

whom he would not put on the witness stand himself for fear of damaging testimony. McCormick notes that this latter fear is the more realistic basis for allowing the inference to be cited, for the witness' favorable attitude to one party would perhaps make him a risk that the adversary need not undertake by direct examination. McCormick, *Evidence* (2d ed. 1972), p. 657, sec. 272. Thus the possession and actual use of the deposition may in some cases indicate that the party who seeks the inference should not be accorded the missing witness instruction or even be barred from commenting on such absence. In this case, however, the missing witness was an employee of the defendant transport carrier and a potential party defendant. His testimony is not cumulative as no one else can speak for his recollection. Finally, although he may have had "only one story to tell and he told it," the value of actual trial testimony lies as much in how the story is told as in what the story is. The trial court found that the conflicts in evidence made this a "classic case for the jury" and the deposition of the driver contained a crucial repudiation of the police accounts of his post-accident interview: the veracity of this explanation was not conveyable through the read-in deposition. We think no prejudicial error arose in the use of the missing witness instruction.

Finally, in instructing the jury on the ordinary burden of proof, the trial court erroneously used the word "probability" in place of "certainty" in Wisconsin Jury Instructions—Civil, Part I, 200:

". . . This burden is to satisfy you, to a reasonable *certainty*, by the greater weight of the credible evidence that 'yes' should be the answer." (Emphasis supplied.)

The rest of the instruction, defining "greater weight" and "credible evidence" was given. "Reasonable certainty" was first used in *Kausch v. Chicago & Milwaukee Electric Ry. Co.* (1922), 176 Wis. 21, 26, 186 N. W. 257,

as a shorter version than lengthy attempts to explain "burden of proof" and "preponderance of evidence." The phrase is not used when a general verdict is involved, although in all other respects the instruction is the same. *See:* Wisconsin Jury Instructions—Civil, Part I, 200. This would indicate that the use of probability rather than certainty, although not to be encouraged, was not harmful here. A rather extensive instruction on the balance of testimony offset any effect of the error; instructions are to be judged as a whole and prejudicial error will not be found unless the instructions "would probably, not possibly, mislead the jury." *Savina v. Wisconsin Gas Co.* (1967), 36 Wis. 2d 694, 154 N. W. 2d 237.

*Impeachment of witness Roth.*

Plaintiffs called as a witness a Mr. Ronald Roth, who had alleged to be a witness to the accident in a pretrial deposition and earlier signed a statement given to plaintiff's counsel. At the trial, Roth stated he had an independent recollection of the occurrence; he then proceeded to deny ever having been on the bus or having witnessed the accident.

In response to the defendant's objection to the use of leading questions and to the use of the statement and deposition as impeaching evidence, the trial court allowed such impeachment and gave an immediate instruction that such testimony was not to be considered substantive evidence.

No dispute exists as to the common-law rule that a party may cross-examine for impeachment of its own witness, if the witness gives testimony that is contrary to other material statements, and such recanting is a surprise to the party. *Tills v. Elmbrook Memorial Hospital* (1970), 48 Wis. 2d 665, 180 N. W. 2d 699. Although some cases hold that a denial of knowledge

concerning the subject matter is not prejudicial and thus does not justify a party to impeach the witness to show why he had been called, 58 Am. Jur., *Witnesses*, p. 446, sec. 800, and footnote 18, the testimony of Roth went beyond this to flatly contradict prior statements as to his whereabouts and observations.

Under a strict reading of the authorities for this rule, it is apparent that the plaintiff exceeded the allowed purpose of the cross-examination. Once Roth denied being on the bus and denied observing the accident, the plaintiff was allowed to impeach him and show his statements to the contrary, and thus inferentially explain why such a prejudicial witness had been called by him. If Roth agreed that he was a witness, but then gave testimony to factual material inconsistent with prior factual assertions of the event, the plaintiffs would have then been justified in impeachment by a showing of the prior factual assertions. That was not the case here. Plaintiff's counsel read in portions of Roth's deposition allegedly concerning his observation of a certain item of clothing worn by Victorson, his observations of attempts to alert the driver of the accident, and of his recollection that only Victorson alighted from the side exit. This was after plaintiff's counsel read in the entire statement signed by Roth which generally covered the same material. Although all of these matters were impliedly contradicted by Mr. Roth's assertion that he did not witness the occurrence, the purpose of impeachment was satisfied merely by revealing undetailed prior assertions that he had seen the accident, which were shown to exist and which were used by plaintiff's counsel. The recitation of details went beyond the allowable purpose.

The adoption of sec. 906.07, Stats., which allows that the credibility of a witness may be attacked by any party, including the party calling him, grew mainly out of dissatisfaction with the rule against impeachment

of a party's own witness. With this rule under attack, the narrow scope of impeachment under its exception is similarly weakened. Although this provision of the new evidence code was not effective at the date of the trial, *Tills* did indicate liberalization of the rule. We conclude that the expansiveness of the impeachment allowed here was not prejudicial to the defendant. Both counsel properly and effectively noted the lack of credibility of Roth in their closing arguments.

*Reduction of spouse's claims.*

The trial court, in reliance on the decision of *Schwartz v. Milwaukee* (1972), 54 Wis. 2d 286, 195 N. W. 2d 480, refused to reduce the award to Lillian Victorson of $15,000 for loss of consortium and $5,000 for personal services rendered. In *Schwartz,* it was stated (p. 293):

> "Since the cause of action for consortium occasioned by an injury to the other spouse is a separate cause of action which never belonged to the other spouse, it is not subject to the defenses which are available against the other spouse's cause of action."

Counsel for the parties concede that the subsequent decision of *White v. Lunder* (1975), 66 Wis. 2d 563, 225 N. W. 2d 442, explained this principle. This court in *White* considered the conflicts that existed between *Schwartz* and earlier cases. In *White* this court stated (p. 574):

> "We deem it appropriate to declare, for the purpose of applying our comparative negligence statute, that both the causes of action for medical expenses and loss of consortium shall be deemed derivative; and that the causal negligence of the injured spouse shall bar or limit the recovery of the claiming spouse pursuant to the terms of the comparative negligence statute."

In adopting a uniform rule for consortium and other collateral claims, the court gave consideration to those instances where the collateral claimant also had participated in the injury occurrence and those cases where the claimant was not involved, as here. The *White Case* factually was of the former circumstance. Thus, the "derivative" claim required the individual comparison of the principal injured party's negligence and the collateral claimant's negligence with the negligence of the defendant for purposes of determining whether a recovery on the claim would be allowed by our comparative negligence statute. If each separate individual proportion was not greater than the defendant's fault, derivative recovery was allowed but reduced by the proportions of negligence attributable to both the principal and the collateral claimant spouse. *Id.* at 576. If either party had negligence exceeding that of the defendant, then no derivative recovery could be had.

This method is necessary because of the interrelated nature of the claims and because of the policy embodied in sec. 895.045, Stats., the comparative negligence statute.

Under the facts here, the derivative claim of $15,000 for loss of consortium by the plaintiff's wife, Lillian Victorson, must be reduced by her injured spouse's negligence of 35 percent. That proportion of negligence is less than that attributed to the defendant, such that recovery of $9,750 should be allowed instead of $15,000.

Respondents indicate that perhaps the award for nursing services rendered by Mrs. Victorson is not subject to such a reduction. We do not agree. In *White,* the claim for medical expenses, which are indistinguishable from a claim for caretaking services, was considered derivative. Therefore, the derivative claim of the wife for her caretaking services must be reduced by the percentage of her husband's negligence. An amount of

$3,250 (65 percent of $5,000) is the proper award for the claim.

*Future loss of earnings.*

The jury returned individual awards for loss of earnings to date and for loss of future earnings. In response to post-trial motions, the trial court disallowed the latter amount. Victorson died shortly after the trial. His disabling stroke, however, had occurred almost a half year before the trial. Should the effects of this stroke, insofar as it acted as an independent occurrence that disabled, be given significance as a limit on the award for post-trial future earnings? We think the question must be answered in the affirmative.

Testimony established that the stroke was caused by arteriosclerosis, an obstruction of the arteries to the brain. It effectively paralyzed the entire right side of Mr. Victorson. The doctor who supervised the treatment for the stroke commented that although many stroke victims can eventually perambulate, it would involve too many theoretical possibilities to speculate on such a future for Mr. Victorson. He did consider that the effects of such a stroke would render a person unemployable even if he had a good leg on his unparalyzed side.

Since the subsequent stroke was shown to be totally disabling without concurrence of the previous injury, and was shown to be totally independent from the prior disability, the defendant is relieved of responsibility for future earnings from the date of the subsequent injury. The trial court properly disallowed the award for future loss of wages.

We conclude that there is sufficient credible evidence upon which the jury could find the defendant was negli-

gent in respect to the manner in which its bus was operated or equipped.

The judgment awarding $15,000 for loss of consortium and $5,000 for personal nursing care to Lillian Victorson is reduced to $9,750 and $3,250 respectively in conformity with this opinion.

*By the Court.*—Judgment modified and, as modified, affirmed.