STATE v. JAMES MYERS, Appellant.—No. 38236.—172 S. W. (2d) 946.

Division Two, July 6, 1943.

*Wright & Ford* and *Ellis G. Cook* for appellant.

*Roy McKittrick,* Attorney General, and *W. J. Burke,* Assistant Attorney General, for respondent.

334

**LEEDY, P. J.**—This is an appeal from a judgment of the Nodaway Circuit Court whereby defendant, upon conviction, was sentenced to a term of 25 years in the penitentiary. The record and briefs in this case create confusion and uncertainty with respect to the nature of the conviction, except that it was under the Habitual Criminal Act. The state's brief, in the opening paragraph, says the information charged defendant "with burglary and grand larceny with explosives in the nighttime." Later, in the same paragraph, it is stated "defendant was tried and convicted of burglary with explosives in the nighttime." Defendant's statement informs us he "was charged with the crime of burglary and attempted larceny in the nighttime with explosives . . . and found guilty." The jury returned a verdict of "guilty as charged in the information" and made an affirmative finding concerning his prior conviction, and assessed his punishment as stated above.

Where a person is charged with two distinct offenses (as permitted in burglary and larceny prosecutions under Sec. 4448 Mo. R. S. A., which makes an exception to the general rule that a person cannot on the same trial be convicted upon two different and distinct felonies), and it appears (as here) that the jury did not make separate findings as to each charge, and separately assess the punishment, the verdict cannot stand. [State v. McHenry, (Mo.) 207 S. W. 808, and cases cited.] "The verdict and judgment are part of the record proper which it is our duty to examine for error, whether or not any error appearing in the record proper be assigned by the appellant in his motion for a new trial or in his brief filed in this court." [State v. Meadows, 331 Mo. 533, 55 S. W. (2d) 959.]

The information is based on Sec. 4446, which denounces the

crime of burglary with explosives.[1]  Said information is modeled after, and substantially follows, with appropriate changes made necessary on account of differences in the facts, the one approved in State v. Howard, 242 Mo. 432, 147 S. W. 95, and sufficiently charges the single offense defined by said section.  So **[948]** that the general verdict rendered, that of ''guilty as charged in the information'' (together with the finding as to prior conviction) was sufficient, and did not offend against the rule just noticed.

■ The record proper shows that upon allocution, defendant was informed by the court that he had ''been tried by a jury and found guilty of *attempted* burglary with explosives in the nighttime as charged in the information,'' for which offense, he was then and there sentenced under the judgment entered.  The information having charged, and the jury having found the defendant guilty of, the offense of burglary with explosives, it follows that the judgment and sentence should have conformed to the verdict, and sentence for an *attempt* to commit said offense was unauthorized.  [For analogous cases, see LaGore v. Ramsey, (Mo.) 126 S. W. (2d) 1153; State v. Duff, 253 Mo. 415, 161 S. W. 683; State v. Gregory, 178 Mo. 48, 76 S. W. 970.]  Moreover, Sec. 4836 Mo. R. S. A., expressly prohibits the conviction of a person for an attempt to commit any crime ''when it shall appear that the crime intended or the offense attempted was perpetrated by such person . . . in pursuance of such attempt.'' For the reason just noted, the case will have to be remanded for the limited purpose of sentencing defendant, and rendering judgment upon the verdict as returned by the jury, unless reversible error affecting the merits is found.

The conviction was obtained on circumstantial evidence, the sufficiency of which is vigorously challenged.  This point will be considered first, and in connection with a related question raised by an assignment alleging error in the refusal to strike the testimony of the state's chemist concerning a test made upon a pair of gloves which were taken from defendant's person when he was arrested during the late morning or early afternoon of the day the burglary was committed.  The complaint made by the defendant in challenging the sufficiency of the evidence goes no further than that the proof adduced was insufficient to connect defendant with the crime.  The evidence was abundant to show that the Bank of Conception, located at Clyde, in Nodaway County, was burglarized in the early morning hours of Monday, April 6, 1942, and that explosives were used therein in an unsuccessful attempt to open the bank's vault.  Summarized, the state's showing was to the following effect:

---

[1]''A person who, with intent to commit some crime, breaks and enters any building in the nighttime, and, for the purpose of committing any crime, uses or attempts to use nitroglycerine, dynamite, gunpowder, or any other high explosive, is guilty of burglary with explosives.''  [Sec. 4446 Mo. R. S. A.]

The president of the bank, Charles A. Teson, closed the bank and locked all the doors between 5:30 and 6 o'clock on Saturday, April 4, 1942, at which time he left an electric light burning in the room, as was the custom. He did not return to the bank until 9:40 A. M., the following Monday, April 6th. At about 8:30 on Monday morning, Margaret Keefe, a storekeeper, discovered the front door of the bank was standing ajar. She proceeded at once to open up her own store, which was nearby, but she did not immediately notify anyone about what she had seen, but later, "probably an hour—three quarters of an hour" she notified Teson. At about 9 o'clock, or shortly thereafter, Joe Enis, the Wabash agent, was passing the bank and he saw the door was open a little, and that no one was inside; he entered, and noticed "something had gone wrong," and left—"went out in the street." He did not give any alarm or report his findings to Teson or anyone else—simply "went out and did nothing." A boy had followed him into the bank, but he made the boy "get out." The night light in the bank was not burning at that time.

As stated, Teson arrived at the bank at 9:40. Two highway patrolmen were called, and they reached the scene shortly after 10 o'clock. In the meantime, a deputy sheriff, one Hartness, had been there, and, in the presence of Teson, and perhaps others, examined the premises including the vault door; but Hartness was not called as a witness. Teson and the patrolmen testified concerning the surroundings to this effect: That the front doors had been pried open, and that the hasp and padlock on the back door had been broken, and said door was propped open with a 2x4. Upon entering the bank it was found that there were particles of dried paint "over everything—floors, and desks, and chairs . . . the floor was practically covered with it . . . and on the teller's cage." The vault door had been "wrecked," the knob which held the combination "was gone, and burned places where the bolt went through it." The combination, some pieces of barbed wire (removed from a fence in the rear of the bank), burned matches, pieces of cotton, and burned fuse were found on the floor. There was liquid on the floor at the bottom of the vault door. It further appears that "eventually"—to quote the witness [949] Teson —a slip of paper (State's Exhibit 1) was found by him on the floor" a foot or fifteen inches" from the vault door "among the trash," i. e., the wire, matches, cotton, fuse, etc. Said slip of paper was admittedly a sales ticket issued to, and received by defendant at Ralston, Iowa, on March 31, 1942, and evidenced the sale of a load of corn to him by the Farmers Elevator at Ralston. It bore defendant's name. (Defendant testified that after he trucked said load of corn to South St. Joseph and sold it, the sales ticket had served its purpose, and was disposed of by being thrown from his truck and out into the street in South St. Joseph.) The sales ticket was not found until the highway patrolmen arrived, which was after the examination

made by Hartness, at which Teson was present, as stated. In the meantime, "about half a dozen people," besides Hartness and Teson had been in the bank; and when discovered and picked up by Teson, no particles of dried paint from the ceiling were found on the slip of paper. Teson handed it to Walker, one of the patrolmen. He and the patrolmen then went upstairs over the vault, and found that the floor had been torn up, three boards wide and four or five feet long. It was a double floor, and in the second or lower floor, there was a hole as large as a hand—"holes had been bored in and then ripped up— several been split pretty bad." Sawdust was found. The night light which had been left burning Saturday evening was out, the bulb having been partially unscrewed. It was examined for fingerprints, as were the premises generally, but none were found. A mechanic was called to open the vault, and when he applied an acetylene torch there was an explosion near the bottom of the door, as a result of which the door was sprung, and it was split a distance of six or eight inches.

It was shown by Enis, the Wabash agent, that he met the 3:57 A. M., train for the purpose of getting the mail and delivering it to the post office; that en route from his home to the depot, he passed the bank shortly after 3:30, and at that time noticed that two of the street lights were not burning, one at the post office corner (some 130 feet north of the bank) and the other at the depot, two blocks south of the bank. After the train arrived , and on his return trip, which he fixed as 4:10, he observed that the night light was burning in the bank. He did not notice the latter on his trip to the depot. He saw no automobile, either moving or parked, on the trip from his home to the depot and return. This witness was also an employee of the light company, in which capacity he replaced the light globes, both of which had been broken.

Reta Weiderholt was sleeping at the telephone office on the night in question. She retired between 11:00 and 11:30, and sometime before daylight she was awake, and heard a noise "like a shot." She did not get up or look out, or otherwise investigate.

After completing their examination of the premises, the patrolmen went to Hopkins, some 35 miles from Clyde, and arrested defendant at his home. He was taken to the county jail at Maryville, and searched. The patrolmen took from his person a billfold containing $390.00, a pocketknife, keys, a "weigh ticket" for a load of corn, and a pair of brown cotton flannel, or jersey, gloves. The latter were wet and twisted. Defendant was then taken to St. Joseph where he was again searched, and the gloves which had been taken from him at Maryville were again taken from him. It does not appear how defendant had gotten possession of them in the interim. The defense was an alibi.

The state sought to introduce the gloves in evidence. Preliminary to their introduction, the state called a chemist, employed

in the laboratory of the Highway Patrol at Jefferson City, who testified concerning a test made on the gloves. The state offered the gloves in evidence at the conclusion of his testimony, and defendant objected because it was not shown that they were in the same condition when tested as when taken from the defendant. The court sustained the objection, and the gloves were excluded. The defendant then moved that the testimony of the chemist concerning the test be stricken for the same reason, and this was overruled, defendant excepted, and on this appeal, he urges the matter as his "most important complaint."

In order to admit testimony showing the result of the test it was necessary to satisfy the court not only of the identity of the gloves examined as those taken from the defendant, but that they were in the same condition when tested as when taken from him. [State v. Smith, (Mo.), 222 S. W. 455, and cases cited.] We think the evidence was sufficient to establish the identity of the gloves tested as those taken from defendant when he was arrested, [950] but insufficient to show that their condition was the same at both times. Both Walker and Harrison, the highway patrolmen, testified that they were the same gloves. Walker took them from the defendant when he was arrested and turned them over to Harrison. They were "wet and twisted" at that time. At the police station in St. Joseph the gloves were placed in an envelope with other personal effects of the defendant. "Later" Harrison got the gloves out of the envelope, put them in another one, marked it and turned the same over to a patrolman or patrolmen from Lee's Summit. Said envelope "had clamps, and they were clamped." Harrison expressly disclaimed knowledge of the condition of the gloves when taken from the defendant. Walker examined the gloves before they were placed in the envelope, at which time, he testified they had "spots and splinters of wood"; spots were "at the left index finger and in the palm of the hand." It appears that when produced at the trial, some of the material had been cut away from the gloves. The witness just mentioned testified that "with the exception of the small portion of the gloves which had been cut away where the spots were" they were in the same condition at the trial as when taken from the defendant, with the further exception that when taken from defendant "they were wet and had splinters"; that they "had those spots and splinters when they were given to Harrison." Walker further testified he did not see the gloves after giving them to Harrison, did not know what happened to them, or what was done to them. There was no evidence whatever as to when, where, or from whom the chemist received the gloves. The only evidence touching the manner in which he received them, and their condition at the time of the test, is shown by the following excerpts from the chemist's testimony: An envelope was exhibited to the witness and he was asked "If this is the envelope in which they

[the gloves] were at the time that you received them?", and he answered, "Yes." "Q. I will ask you if the gloves at the time you received them were in the same condition as Mr. Walker described?" Defendant interposed an objection, which, after extended argument, was overruled, and the witness was directed to answer the question. His reply was: "When I received the gloves in this envelope and this was closed. It was not sealed but metal fasteners bent over. I noticed two spots on them particularly, in addition to very small particles of wood; however the gloves were dry. They were not wet." We have set out all of the evidence in relation to the point, and are constrained to hold it does not meet the requirement in chemical analysis cases that the circumstances must be such as to establish a reasonable assurance that it was not only the same thing, *but in the same condition*. The state is not aided by the general rule that where demonstrative evidence is *sufficiently* identified it may be introduced, notwithstanding the testimony does not directly trace it from hand to hand. [State v. Burney, 346 Mo. 859, 143 S. W. (2d) 273; State v. Shawley, 334 Mo. 352, 67 S. W. (2d) 74. Neither of these cases involved the condition of an object at the time it was subjected to chemical analysis.] Having properly excluded the gloves themselves because not shown to have been in the same condition, it follows that it was error to refuse to strike the testimony as to the result of the test. We do not understand the defendant argues that the state would not have made a case if the proper foundation had been laid for showing the result of the test, and so it is unnecessary to decide whether in the absence of the testimony which we hold should have been excluded, the other circumstances relied on are sufficient to make a case for the jury.

Defendant complains of the giving of Instruction #10, on the subject of an attempted jail break, "for the reason that there was not sufficient testimony offered on the part of the state to warrant the giving of said instruction." The evidence on the question was to the following effect: That on Tuesday before the trial, defendant and another prisoner, were seen at the jail window; that the sheriff had been attracted by a noise, and he stood underneath the jail window and saw the tops of the heads of the two men, and he could hear them "sawing." Upon investigation it was found that two of the upright bars had been "sawed out," and the place hidden by tape and boards; two hack saw blades and some files were found in Moore's cell. In the light of this showing it must be held that defendant's contention is without merit.

As the case must be remanded, we take occasion to say that on another trial the proof of the analysis should be more fully developed. The record merely discloses that, at a time not shown, spots on the gloves were "tested for nitrate," and (indefinitely) that the reaction was "positive"; [951] and that said element was common to nitro-

glycerin and "a good many" other substances—whether as many as "half a million of them," he was uncertain.

Without expressing any opinion as to the merits of the complaint against the instruction on credibility of witnesses, we suggest the elimination of the phrase assailed, and the use of an approved form. The precedents are ample.

The judgment is reversed, and the cause remanded. *Tipton, J.,* concurs; *Ellison, J.,* concurs in separate opinion.

ELLISON, J. (concurring).—I concur in the principal opinion but desire to add a few words on the ruling made therein that the trial court properly excluded the appellant's cloth gloves from evidence because the proof was insufficient even prima facie to show they were in the same condition when later tested by a chemist as when they were taken from the appellant. There was good reason for thinking nitroglycerin had been used in blowing up the bank safe. No finger-prints were found on it, indicating the burglar had either worn gloves or had wiped his finger prints from it. The gloves were taken from the appellant soon after his arrest the next day. They had spots on them at the left index finger and in the palm of the hand. The chemist who afterward examined them said (though rather vaguely) that he tested the spots for nitrate and the reaction was positive. He stated nitrate is an element of nitroglycerine. So the gloves were an important link in the State's chain of circumstantial evidence.

The principal opinion concedes the proof was sufficient to identify the gloves as the ones taken from the appellant, but holds the evidence was insufficient to show they were in the *same condition* when tested as when taken from him. I agree to that, but not on the grounds principally urged below as reasons for their exclusion— namely, that it had not been shown who and how many people had had custody of them until they reached the chemist. Highway patrolman Walker was the officer who took the gloves from the appellant when he was arrested. He testified he noticed at the time they "had those spots on them." When they were exhibited to him at the trial he said they were "in the same condition." This, in my opinion, was enough to show they were in the same condition so far as pertains to anything he, or any non-expert, could ascertain visually. State v. Shawley, 334 Mo. 352, 372(7), 67 S. W. (2d) 74, 84(18).

There are a large number of cases in Missouri where clothes or instruments with blood spots on them have been admitted in evidence. But I have been able to find only one, State v. Ilgenfritz, 263 Mo. 615, 628, 173 S. W. 1041, 1044, Ann. Cas. 1917C, 366, where such an article was excluded for failure to prove its identity by tracing its custody and showing it had not been interfered with purposely or otherwise. That case has not been cited since on that point. On the

other hand later cases state the contrary. Thus, in State v. Smith (Mo. Div. 2), 222 S. W. 455, 458(5), 459(6), which is the decision cited in the principal opinion, the question was whether a human stomach which had been analyzed for poison was in the same condition when tested as when taken from the corpse. The decision said:

"it was necessary to satisfy the court of the identity of the stomach examined with that of Hutsell and that it was in the same condition when examined as when removed from his body. It was not necessary that it should have been hermetically sealed so as to be inaccessible to anybody; it was not necessary to show there was an entire absence of opportunity for anybody to tamper with it; it was only necessary to show the circumstances were such as to establish a reasonable assurance that it was the same and in the same condition. . . .

"The viscera of the deceased in this case were not preserved with that care which should characterize the conduct of an officer in such a case, and the glass jar containing the stomach was carted around in a careless sort of way; but there was no time when anything occurred to suggest a suspicion that the stomach was molested or that any one who might be interested in tampering with it knew that the prosecuting attorney had the jar in his possession when he drove to Mountain Grove and to Norwood. We think the court did not err in admitting the evidence."

In another stomach analysis case, State v. Everhart, 316 Mo. 195, 203, 289 S. W. 604, 608, which was reversed and remanded for other reasons, an objection had been made to the sufficiency of the evidence to prove the stomach examined by Dr. B. was in fact the stomach of the deceased. The opinion observed that objection could be obviated on a retrial, but added (we abbreviate the [952] surnames):
"However, we are not prepared to say that the present proof was insufficient. The proof apparently satisfies the test laid down in State v. Smith (the case just quoted above). The testimony of Dr. H., connecting the stomach shipped to him by Dr. J. with the one examined by Dr. B. would remove all possibility of doubt that they were one and the same stomach." And it is obvious that a human stomach would be much harder to identify than a pair of gloves with spots on them.

The general rule stated in 16 C. J., secs. 1222, 1225, pp. 618, 619, and 22 C. J. S., sec. 712, p. 1207, and followed in State v. Richetti, 342 Mo. 1015, 1033, 119 S. W. (2d) 330, 339(9), is as follows:

"Articles which are shown by the evidence to be connected with the crime, or which serve to unfold or explain it, may be exhibited in evidence, provided they are properly identified, and provided it is shown that there has been no such substantial change in the articles exhibited as to render the evidence misleading."

"The weapons, bullets, tools, instruments, or other articles which appear from other evidence to have been employed in the commission

of the crime are admissible in evidence, even though the act is admitted and insanity is set up as a defense. To warrant the admission in evidence of an instrument or weapon as the one with which the crime was committed, a prima facie showing of identity and connection with the crime is necessary and sufficient; clear, certain, and positive proof is not required. The fact that a considerable length of time elapsed after the crime before the weapon or instrument was found, or that in the meantime third persons may have access thereto, goes to the probative force but not the admissibility of the evidence.''

But granting the foregoing evidence was prima facie sufficient to show the spots on the gloves were in the same condition at the trial as when they were taken from appellant—so far as a layman could determine visually—it does not follow that they were chemically the same. So far as human interference was concerned, perhaps they may have been, and the patrolman's answer that the gloves were in the same condition may have covered that point. But there is no showing that chemical evidences of nitroglycerine would have remained on the gloves merely placed in an envelope, from the time of appellant's arrest to the time of the test (the date of which was not shown). That question was raised in one of the appellant's objections to the introduction of the gloves, when the patrolman was asked whether the gloves were in the same condition as when taken from appellant. Notwithstanding the objection the State made no effort to show by the chemist what kind of test he made, or how long definite chemical traces of the substance would remain on such materials. With that question raised and the other proof on the point so fragmentary, I agree the prima facie showing was insufficient.