STATE of Missouri, Plaintiff-Respondent,

v.

Troy William STARKEY,
Defendant-Appellant.

No. 35409.

Missouri Court of Appeals,
St. Louis District,
Division One.

April 6, 1976.

Motion for Rehearing or Transfer
Denied May 17, 1976.

Application to Transfer Denied
June 14, 1976.

Gilmore & Gilmore, William Gilmore, Sikeston, Legal Aid Society, St. Louis, for defendant-appellant.

John C. Danforth, Atty. Gen., Preston Dean, Philip M. Koppe, Asst. Attys. Gen., Jefferson City, Courtney Goodman, Jr., Pros. Atty., George R. Westfall, Asst. Pros. Atty., Clayton, for plaintiff-respondent.

RENDLEN, Judge.

Defendant appeals his conviction of forcible rape under § 559.260, RSMo.1969, V.A.

M.S., and the sentence of thirty years imprisonment. For reasons we shall discuss, the judgment is affirmed.

Appellant contends the court erred in: (1) permitting introduction of statements and photographs of appellant taken by the police without prior constitutional warnings; (2) admitting testimony concerning the mode of extrajudicial identification of appellant; (3) allowing in-court identification of appellant based on previous improper and suggestive extrajudicial identification procedures; (4) failing to grant a continuance on the day of trial or in the alternative to "strike witnesses" whose names had been endorsed two weeks prior to trial; (5) erroneously admitting certain State's exhibits under the Uniform Business Records Act; (6) improperly instructing as to reasonable doubt and burden of proof; and (7) by overruling appellant's "post-trial motion in arrest judgment or in the alternative for a new trial."[1]

From the evidence the jury could find that D__ Y__[2] arrived by air at Lambert-St. Louis International Airport near midnight on the evening of May 10, 1971. At about 4 a. m. on the morning of May 11 while she waited in the passenger lounge area on the top level of the terminal for a flight to Springfield, Missouri, appellant took a seat next to her and touched her buttocks with his hand. Mrs. Y__ jumped up immediately, took the down escalator to the middle airport level and went to the ladies' rest room.

Jacquelyn Johnson, an employee of the Avis Rent A Car Agency who had seen her several times previously that morning, remembered watching Mrs. Y__ as she came from the upper level and went to the ladies' room at the west end of the building. Finding the west rest room closed for cleaning, Mrs. Y__ turned and walked the length of the building to the ladies' rest room at the east end. As Mrs. Y__ passed

beyond her range of vision, Mrs. Johnson saw a man, whom she identified as appellant, come down the stairway from the upper level and proceed at a fast walk in the direction Mrs. Y__ had just taken. Mrs. Johnson's description of appellant substantially matched that given by Mrs. Y__ except she also noticed a pair of tan-colored gloves hanging from his right hip pocket.

Mrs. Y__ went to the ladies' rest room, entered a stall and when she opened the stall door a few minutes later, was confronted by appellant holding a knife. She could smell alcohol on his breath, his speech was slurred and his hair in disarray. As he came toward her, Mrs. Y__ began to scream, and as she did, he put the knife to her throat, rammed the gloved fingers of his other hand in her mouth and threatened to kill her unless she stopped. No one else was in the rest room as he pushed her back into the stall and locked it. Appellant, by threats and force, made the terrified Mrs. Y__ perform degrading acts and forcibly raped her. Prior to the rape, the prosecutrix unavailingly protested she was pregnant; and though in fact she was six months pregnant, appellant forced her to the floor of the stall there performing the crime for which he stood accused. Her lip and hand were cut during her effort to resist the rape; and appellant, when finished, expressed concern for her cut hand, also stating he was sorry if he had hurt her baby. Following this short-lived remorse, appellant warned against calling the police and stated she should not leave for half an hour.

Immediately Mrs. Y__ dressed, left the ladies' room and ran to the first person she saw, an airport maid, screaming she had been raped. The maid notified the authorities and later described the prosecutrix as having blood on the top of her blouse and that she was "shaking and trembling all over, really upset." Blood was found on the toilet seat, floor and walls of the area

---

1. The quoted language taken from the "Points and Authorities Relied On" section of appellant's brief is patently inadequate to preserve the point for review.

2. Victim of the rape shall be referred to herein as D__ Y__ or Mrs. Y__.

where the rape occurred and the medical testimony of Mrs. Y___'s condition was corroborative of the fact of rape. A description of the assailant was broadcast to airport officers.

At about 2:30 a. m. the same morning, officer Orson Howell of the airport police, while patrolling the parking area of the lowest level of the airport garage, observed a lime green pickup truck, bearing the name of a fencing company in Hazelwood, with an iron frame rack too tall to clear obstructions in the garage. The driver, later identified as appellant, alighted to pick up a wheelbarrow which had fallen from the truck and spoke to Howell, who noted he was wearing greenish pants and a long-sleeved striped shirt. Howell testified he was "acting kind of funny, I don't know whether he was drinking or not" and helped appellant back his truck from the driveway. About five minutes later he saw the truck backing into the driveway from the other side of the building. Again he spoke to appellant, noticing then a discoloration around his left eye. Shortly afterward, about 2:45 to 3 o'clock a. m., Howell saw the truck for a third time parked at the top level of the airport garage. When he returned to that area about 5 a. m., after the broadcast of the rape report, the truck was gone.

Approximately six days later, officers assigned to investigate the crime, while canvassing the Hazelwood area, saw a truck matching the description given by officer Howell parked behind an apartment they later learned was appellant's residence. Their first efforts to investigate among residents of the building were unsuccessful but two days later appellant answered their knock and when advised they were police officers, invited them into his home. Explaining they were investigating a rape at Lambert Airport, officer Hollandsworth

asked appellant if the truck parked outside was his.[3] Appellant admitted the ownership but denied having been at the airport on the date in question. When they stated his appearance matched the description of the rapist, even his discolored left eye, appellant denying involvement made several exculpatory statements. They asked if he would voluntarily come to the police headquarters and have his picture taken to which appellant consented, coming there in his own vehicle with his two minor children. The photographs were taken and appellant left. At no time was he under arrest and officer Hollandsworth testified that he and his partner had not gone to appellant's residence with the intention of placing him under arrest.

## I.

■ Appellant first contends his statements made during the first meeting with police officers at his home and photographs taken at the station later that day were erroneously admitted at trial because no prior Miranda[4] warnings were given. This contention is without merit. When officer Hollandsworth and his partner knocked on appellant's door on May 18, appellant answered, invited them in and the following transpired.

"Q (prosecutor): Did you explain to Mr. Starkey why you were there?

A (witness Hollandsworth) Yes, sir.

Q What did you tell him?

A Told him that an offense of rape occurred at the airport on the 11th of May and a truck similar to his was seen at that location about that time, and also that the subject matching his description was being sought.

Q Did one of you mention the truck parked out in the rear?

A We asked him if it was his truck?

3. At the time of the original investigation at Starkey's house, the truck matched the description of that seen at the airport on the night of the rape with a sign and a metal rack of the type described. Later when officer Howell was taken to Starkey's residence where he identi-

fied the truck as the one seen on the night of the rape, the iron racks and sign had been removed.

4. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Q What did he say?

A Yes, sir, it was.

Q That's when you told him about the alleged incident?

A True.

Q Did he respond to that?

A He said it couldn't have been him because he was not at the airport that day.

*  *  *  *  *  *

Q (by Mr. Westfall): What else did you say to him?

A We brought up the fact that he matches the description, everything, a discolored left eye or black eye and he said, well, I got that a couple of weeks ago in a fight.

Q Did he in fact have a discolored left eye?

A Yes, sir.

Q What was the next thing that you or he said?

A Well, we asked him if he would go to headquarters and have his photograph taken voluntarily.

Q What did he say?

A He said yes.

Q Did this happen?

A Yes, sir.

*  *  *  *  *  *

Q Did you meet him back at headquarters?

A Yes, sir.

Q What occurred when you arrived back there?

A His photograph was taken and then he left.

Q He was never that morning placed under arrest?

*  *  *  *  *  *

A No, he was not placed under arrest.

Q After the photograph he left?

A True."

It is significant appellant by his testimony substantiated the officers' account in all details except he claimed he told them the black eye occurred *two days* earlier rather than *two weeks*. More important, neither the statements made nor the photographs taken involved "custodial" interrogation or a situation requiring prior *Miranda* warnings. The *Miranda* court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612. In the case at bar appellant was under no compulsion to meet, speak, or remain with police officers. He was not under arrest nor was his freedom of action restrained. As contrasted to *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) in which the officers improperly failed to warn the arrested accused who was not free to leave and questioned him in his bedroom in the early morning hours, the officers here entered appellant's home at his invitation, no threats, air of compulsion or suggestion of arrest appear from the description of the meeting in his living room. Appellant's arrest did not take place until two days after the meeting with the officers and the photographs taken at the station. No probable cause for arrest existed until after his photographs were identified by Mrs. Y—— and officer Howell.

In *United States v. Hall*, 421 F.2d 540 (2nd Cir. 1969), cert. den., 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970), FBI agents went to a robbery suspect's apartment possessing only information that the suspect's automobile was near the scene at the time of a robbery. The agents knew they could not lawfully arrest him and abstained from threats of arrest. False exculpatory remarks made in response to questioning before any *Miranda* warnings were ruled properly admissible and the court commenting on the interrogation in the suspect's home as effected by the mandate of *Miranda*, stated at 545[4]: "[W]e do think it [*Miranda*] suggests that in the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of

their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." The court went on to point out that the amount of information possessed by the police at the time of the interrogation in *Hall,* which closely parallels that in the case at bar, was not such that it caused the officers to bear down on interrogation and create an atmosphere of significant restraint "that triggers *Miranda.*" The mild police activities shown here, as in *Hall, supra,* should not prevent the introduction of the statements made. This court, confronted with a similar problem in *State v. Williams,* 522 S.W.2d 641, 644[1] (Mo.App.1975), applied and restated the rule of *Miranda,* noting that no hard and fast rule can be established as to when custodial interrogation begins; instead it must be determined from the surrounding circumstances and the suspect must be in custody or otherwise deprived of action in some "significant way." In the recent case *United States v. Pohlman,* 522 F.2d 974 (8th Cir. 1975), agents went to the office of an income tax evasion suspect and in conversations there, the suspect admitted not having filed the required returns. The court held, noncustodial investigation of this type does not require *Miranda* warnings. Here we find no inherently compelling pressure which worked to undermine the individual's will to resist and to compel Starkey to speak where he would not otherwise do so freely. See also *United States v. Littlepage,* 435 F.2d 498, 499[1] (5th Cir. 1970), in which a suspect, eventually convicted of receiving stolen goods while moving in interstate commerce, was questioned by special agents of the FBI who came to his home and interviewed him in his apartment for approximately one hour, during which damaging admissions were made. The court held the facts did not constitute "custodial interrogation, triggering the requirements of *Miranda* warnings." There the suspect answered all questions freely, was not *placed* under arrest nor *told* that he would be and no charges were *pending.* Bolstering the quality of the voluntariness of defendant's statements was the fact that

he voluntarily appeared at the FBI office on the afternoon of the same day. In that regard *Littlepage* is remarkably similar to the case at bar in which the defendant voluntarily drove to the police station in his own vehicle with his two daughters and there allowed himself to be photographed following the interrogation by the officers at his home earlier that day. The record here is barren of facts indicating a coercive or compelling atmosphere requiring the giving of *Miranda* warnings. The point is ruled against appellant.

## II.

■ Appellant next contends the trial court erred in permitting officer Hollandsworth to testify that Mrs. Y___ and officer Howell identified appellant's photograph from a group of 12 such photographs, asserting that such testimony is prejudicial hearsay, citing *State v. Degraffenreid,* 477 S.W.2d 57 (Mo. banc 1972). The factual statement in appellant's point is inaccurate. Officer Hollandsworth did not testify that Howell identified appellant's photograph. Hollandsworth said only that Howell was shown the same 12 pictures that had previously been shown to Mrs. Y___ and that appellant's was among them.

With respect to the showing of the photographs to Mrs. Y___, Hollandsworth testified:

"Q What transpired while you were with Miss [Y___]?

A We had photographs.

Q How many?

A Twelve photographs with us.

Q What did you do with those photographs?

A We allowed her to view them.

Q And was the photograph that you already identified as State's Exhibit 13 [appellant's photograph] one of them?

A Yes, sir, it was.

Q Now, did Miss [Y___] in your presence mark any of those photographs?

A She marked that one (indicating).

Q   Let me show you again State's Exhibit 13 and see if you see her mark on there?

\*     \*     \*     \*     \*     \*

A   Yes, sir, I do.

Q   What is it?

A   Her initials, D.Y. and the date, 5/18/71.

Q   She did this in your presence?

A   Yes, sir."

■  We cannot accept the State's argument that Hollandsworth's testimony did not necessarily signify to the jury that Mrs. Y— by marking one of the photographs, identified appellant as her assailant. Since only one of the 12 photographs was so marked and Mrs. Y— had already identified appellant in the courtroom, the jury could not have escaped the conclusion that marking the picture was an identification. However, we find that Hollandsworth's testimony of Mrs. Y—'s extrajudicial identification does not require reversal. It is well-established that the admission of improper evidence is usually harmless if the fact sought to be shown is fully and properly proved by other evidence. *State v. Kennedy,* 513 S.W.2d 697, 700[4] (Mo.App.1974); *State v. Nimrod,* 484 S.W.2d 475, 479[3] (Mo.1972). In the present case the identification of appellant as the attacker is abundantly supported by evidence other than Mrs. Y—'s identification of appellant's photograph. Mrs. Johnson positively placed appellant on the middle level of the terminal as he followed Mrs. Y— toward the east rest room immediately before the attack. Mrs. Y— who was in the presence of her assailant in the lounge area and for a prolonged period under grim circumstances in the east ladies' rest room, positively identified appellant as her attacker. Officer Howell saw, conversed with and assisted appellant at least twice in the airport parking area shortly before the attack. He recognized and described the truck and appellant in detail. This, in addition to the fact that Mrs. Y—'s and Miss Johnson's description of appellant correspond in all details with the description and identification given by officer Howell, (whom appellant admits meeting) is sufficient to establish appellant's presence at the scene of the crime as the rapist, thus rendering the purported hearsay testimony harmless. In *Degraffenreid, supra,* the sole eyewitness to a burglary was a 78-year-old man who allegedly observed defendant from a distance of 75 to 80 feet. The Supreme Court held that the admission of the testimony of a police officer that the witness identified the defendant by a photograph and in a lineup was reversible error. In a concurring opinion joined by five of the six majority judges, Finch, C. J., stated:

"Actually, it [the majority opinion] recognizes that the admission of cumulative evidence may in some cases be harmless error and then finds that Officer Smith's testimony was not harmless. In so ruling, the opinion, as I understand it, states that the fact that evidence is cumulative does not automatically make its admission harmless. I agree with that viewpoint. Actually, each case must be examined to determine whether the particular cumulative evidence admitted therein was harmless and hence not prejudicial, even though erroneous.

If we were dealing with a situation wherein *several* eyewitnesses had positively identified the defendant as a participant in the burglary and the state had offered Officer Smith to confirm that Mr. Gaston had identified photographs of defendant and had picked out in a lineup, we might well conclude that such evidence, even though erroneously admitted, did not operate to the prejudice of defendant and was harmless." (Emphasis supplied.)  477 S.W.2d at 66–67.

It cannot be said here, as it was in *Degraffenreid,* that the hearsay testimony was such as to "tip the scales against defendant." 477 S.W.2d at 64. We find here the challenged testimony was cumulative and harmless.

### III.

■  The third point raised on appeal, that the trial court should not have allowed

the in-court identification testimony of the accused by the victim and officer Howell, since these identifications were induced by the viewing of "conducive and suggestive photographs," has not been properly preserved for review. At trial defense counsel failed to object when the identification testimony of Young and Howell was introduced, which is essential to such preservation. *State v. Daniels,* 487 S.W.2d 465, 468[1] (Mo.1972); *State v. May,* 479 S.W.2d 451, 453[1] (Mo.1972). Further, his pre-trial motion to suppress in-court identification based solely upon the "taint" of an improper lineup, was insufficient to raise the present issue.

■ We find no plain error in the trial court's admission of this testimony; the trial record gives no hint that the photographic identification procedures were "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. U. S.,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). In addition, both Mrs. Y___ and officer Howell had ample "independent basis" for their identification. *State v. Mentor,* 433 S.W.2d 816, 819 (Mo.1968); *Mooring v. State,* 501 S.W.2d 7, 10[2] (Mo.1973); *State v. Carey,* 486 S.W.2d 443, 446[2] (Mo. 1972).

### IV.

■ Appellant's remaining four points have not been preserved as they fail to "state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous . . ." Rule 84.04(d); *State v. Gantt,* 504 S.W.2d 295, 297[1] (Mo.App.1973). Appellant's points are bald assertions of error without explanation why these actions were erroneous. "[P]oints relied on by any appellant [seeking reversal] should definitely isolate and formulate the precise issues to be reviewed, and if that function is observed at all, it should not be relegated to the argument portion of the brief." *State v. Freeman,*

489 S.W.2d 749, 752[1] (Mo.App.1973). "The appellate courts of this State can no longer afford the luxury of searching the Argument section of appellant's briefs for the purpose of discovering if sufficient particularity might be found therein to enable them to determine why the orders or judgments of a trial court are erroneous." *Griffin v. State,* 513 S.W.2d 706, 708 (Mo.App. 1974).

■ We have nonetheless examined these points in detail for plain error under Rule 27.20(c), V.A.M.R. We find no abuse of the trial court's wide discretion in denying appellant's motion for a continuance, *State v. Thomas,* 433 S.W.2d 537, 539[1] (Mo.1968), or in the alternative to strike witnesses (appellant's point IV) because the witnesses were known and available for interview two weeks before the day of trial. Appellant has failed to meet his burden of showing prejudice from the late endorsement. *State v. Goodpaster,* 438 S.W.2d 256, 257[1] (Mo.1969). The trial court did not err in admitting State's Exhibits 15 and 16 (App. point V) as the testimony of the custodian of those records qualified them for admission under the Uniform Business Records as Evidence Law, § 490.680 RSMo. 1969, V.A.M.S. See *Rossomanno v. LaClede Cab Co.,* 328 S.W.2d 677, 681–2[10, 11] (Mo. banc 1959). Point VI alleges error in giving the pre-MAI instruction on burden of proof and reasonable doubt. This contention has been ruled repeatedly and found to be without merit. See *State v. Martin,* 511 S.W.2d 777, 778[2] (Mo.1974). Appellant's final point is that the court erred in overruling his post-trial motion in arrest of judgment or in the alternative for a new trial. The point as stated is patently defective but a reading of the argument portion of appellant's brief reveals the point is based on the alleged insufficiency of the evidence and that the prosecutrix was not a credible witness. We find the evidence sufficient to sustain the verdict and "the credibility of witnesses and the weight of the testimony are within the province of the jury and are not matters for review on appeal." *State v.*

*Tschirner,* 504 S.W.2d 302, 308[18] (Mo.App. 1973).

Finding no plain error, we affirm.

WEIER, P. J., and DOWD, J., concur.