STATE of Missouri,
Plaintiff-Respondent,

v.

Ollie FLEMING, Defendant-Appellant.

No. 39430.

Missouri Court of Appeals,
Eastern District,
Division 3.

Jan. 30, 1979.

Robert C. Babione, Public Defender, Terry Burnet, Asst. Public Defender, 22nd Judicial District, St. Louis, for defendant-appellant.

John D. Ashcroft, Atty. Gen., Gregory W. Schroeder, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

REINHARD, Presiding Judge.

Defendant, Ollie Fleming, appeals from a conviction of Burglary First Degree and Forcible Rape. The jury assessed punishment at five years on the burglary count and fifteen years on the rape count. The court ordered that the sentences run consecutively. As error, the defendant alleges three points: 1) the giving of an instruction which read in the alternative that the defendant broke into the rape victim's home by use of false keys; 2) the overruling of defendant's objection to Assistant Circuit Attorney's comments in closing argument regarding "reasonable doubt"; and 3) the admittance of testimony from a criminalist regarding sperm stains found on the nightgown of the rape victim.

Before considering these points, we must relate the relevant facts. The prosecutrix testified that she and her two children lived with her brother. The bedrooms were on the second floor. The brother slept in the room with her two small children. She stated that she had gone to bed on the evening of October 11, 1976 at about 10:30 p. m. after checking the locks of the kitchen and patio doors, the only two entrances. She awoke to find the defendant standing in the hallway holding a knife. The defendant entered the bedroom and put the knife to the prosecutrix's face. He told her to keep quiet or he would kill her. The defendant then told the prosecutrix to lie down on the bed. She refused and requested to go to her daughters' room to see that her brother and children were safe. Defendant tied the prosecutrix's hands, put his arm around her neck, placed his knife at her throat and led her to see her brother and children safely sleeping, all the while threatening to cut her throat if she spoke. After pulling the prosecutrix back to her room, the defendant had intercourse with her without her consent. Thereafter, defendant sat on the bed and talked to the prosecutrix, continuing to hold the knife.

She asked him, "How did you get in my house?" The defendant responded by jingling the keys in his pocket. The prosecutrix then asked him, "Did you have a key?" The defendant did not answer but subsequently said he could get in the apartment any time. After defendant left, the prosecutrix woke her brother who notified the police. The prosecutrix stated that the police arrived about 10 or 15 minutes later and took her pink nightgown. Later that morning the police took her to Homer Phillips Hospital. A few days after the incident, the prosecutrix identified the defendant as her assailant by photographs provided by the police and in a line-up at the police station. She again identified the defendant at trial.

The prosecutrix's brother testified that before retiring for bed on the night of October 11, 1976, he checked the patio door and all the windows to make sure they were secure. He told his sister to lock the kitchen door, the only other means of entrance. After his sister awoke him early in the morning of October 12, 1976, the brother went downstairs and saw both doors open. Upon examination, he found no pry marks or damage to the lock of the kitchen door but did discover that the top lock securing the sliding door appeared to have been loosened.

A detective, who arrived shortly after the rape to investigate the apartment, testified that there appeared to have been tampering with a lock on the sliding door other than the top lock. More particularly he testified that on the frame of the door there was a piece of metal into which a latch fit and that the metal appeared to have been forced away from the frame.

The defendant's case consisted of evidence that established an alibi defense which placed defendant in the home of a friend on the night and early morning of the rape.

The defendant does not challenge the sufficiency of the evidence on the rape charge. He alleges the court erred "in giving Instruction No. 5, MAI–CR 7.20 submitted by the State, in that the State had not present-

ed substantial evidence to justify submitting the second alternative contained in Paragraph Third: ' . . . or by unlocking an outer door by means of false keys . . . ' "

■ The law in Missouri requires that, "Instructions must be based upon substantial evidence and the reasonable inferences to be drawn therefrom." *State v. Cole*, 377 S.W.2d 306, 308 (Mo.1964). Further, the trial court can instruct the jury on alternative theories of guilt as long as each is supported by evidence. *State v. Green*, 511 S.W.2d 867, 874 (Mo.1974); *State v. Mullen*, 532 S.W.2d 794, 797 (Mo.App.1975).

■ In *State v. Young*, 345 Mo. 407, 133 S.W.2d 404 (1939), the Supreme Court of Missouri, on the following facts, found a prima facie case of burglary in the first degree with entry by means of false keys: 1) all doors and windows had been locked when those burglarized went to bed; 2) no one had permission to enter the premises but those living inside; and 3) no evidence had been introduced that the locks or windows had been broken. The *Young* court held that, "Since the door and lock were undamaged the burglar could have opened the door only by turning the lock." *Id.* at 412, 133 S.W.2d at 407–08. The *Young* court liberally defined the term "false key" by referring to Funk & Wagnalls New Standard Dictionary as "a contrivance, or a key other than the proper key, for opening a lock . . . ." and therefore inferred that the first degree burglary statute comprehended any kind of key capable of being employed and intended to be employed in housebreaking. *Id.*

Here too, we have evidence that all the doors and windows were locked. Here we have some evidence of tampering with the sliding door, a factor not presented in the *Young* case. However, here we have the evidence of defendant's jingling the keys in response to prosecutrix's question as to how he got in. Further, defendant told the prosecutrix that he could get in her home any time. We find that there was sufficient evidence from which a jury could have inferred that defendant gained entry by means of a "false key."

Defendant contends that the court erred in permitting the Assistant Circuit Attorney to state in his closing argument that "reasonable doubt" did not mean "beyond a shadow of a doubt" or "beyond any and all doubt."

■ It is improper for a prosecutor to define "reasonable doubt" in closing argument. *State v. Belleville*, 530 S.W.2d 392, 395 (Mo.App.1975). However, a prosecutor is not precluded from discussing "reasonable doubt" during closing argument. *State v. Wilbon*, 561 S.W.2d 133, 134 (Mo.App. 1978). We believe that the comments in this case do not constitute an attempted definition, but fall within the bounds of proper argument, *State v. Wilbon, supra*; in any event, even if error, the statements did not constitute prejudicial error. *State v. Henderson*, 547 S.W.2d 141, 144 (Mo.App. 1976).

As his final point on appeal, defendant submits the trial court committed prejudicial error in overruling his objection to the testimony of a criminologist regarding examination of sperm stains found on the prosecutrix's nightgown. The police laboratory criminologist testified that he ran certain tests on the stains as well as on the saliva of defendant. The defendant objected to the testimony because the state did not establish a proper chain of custody in handling the nightgown, thereby failing to show that the nightgown had remained in an unchanged condition from the time it was taken until it was tested.

The prosecutrix at trial identified her nightgown and it was admitted without objection. She testified that defendant had ejaculated and that her nightgown had been wet. She gave the nightgown to police sometime after 5:20 a. m. Witness Crowe, the criminologist, testified that he found the gown in his evidence locker after 7:30 a. m. He testified that he found sperm on the nightgown when he tested it. On cross-examination Crowe testified that contamination was possible by depositing a large amount of sweat upon the sperm sample prior to testing. There was no testimony as to the whereabouts of the nightgown

from the time the gown was given to the police officer until placed in the locker.

The defendant relies on *State v. Myers*, 351 Mo. 332, 172 S.W.2d 946 (Mo.1943), to support his contention that there was insufficient evidence to show that the condition of the nightgown as to the sperm stains was the same when tested as when delivered to the police by the prosecutrix. The facts in *Myers* are somewhat similar to this case. The state contends that there was sufficient evidence reasonably showing that the sperm on the nightgown had not been altered or contaminated. See *State v. Johnson*, 539 S.W.2d 493 (Mo.App.1976).

 Error, if any, in the admission of this evidence was harmless. As Judge Rendlen stated in *State v. Starkey*, 536 S.W.2d 858, 864 (Mo.App.1976), "It is well-established that the admission of improper evidence is usually harmless if the fact sought to be shown is fully and properly proved by other evidence." The state made a strong case on the rape charge apart from the challenged testimony. Error which in a close case might call for reversal may be disregarded as harmless where the evidence of guilt is strong. *State v. Vernor*, 522 S.W.2d 312, 316 (Mo.App.1975); *State v. Kennedy*, 513 S.W.2d 697, 700 (Mo.App. 1974).

CLEMENS and GUNN, JJ., concur.