**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Elijah V. HORNE, Defendant-Appellant.**

No. 50076.

Missouri Court of Appeals,
Eastern District,
Division Two.

March 25, 1986.

Motion for Rehearing and/or Transfer
Denied May 6, 1986.

Application to Transfer Denied
June 17, 1986.

Henry B. Robertson, Public Defender, St. Louis, for defendant-appellant.

John M. Morris, Asst. Atty. Gen., Paul J. Larose, Jefferson City, for plaintiff-respondent.

REINHARD, Judge.

Defendant appeals after his conviction by a jury. The court found defendant to be a dangerous and persistent offender and sentenced him to consecutive terms of imprisonment of forty years for forcible rape, forty years for forcible sodomy, thirty years for kidnapping, ten years for armed criminal action, ten years for one count of unlawful use of a weapon, and ten years for a second count of unlawful use of a weapon. He was acquitted on one count of sodomy. Affirmed in part; reversed in part.

The evidence adduced at trial showed that on August 19, 1984, at approximately 1:00 a.m., P_____ B_____, age eighteen, Tanya Loggins, age thirteen, and their niece, Tonya Loggins, age twelve, were

walking home from a dance when a car pulled up beside them. A man, identified by the three as defendant, got out of the car, pointed his gun at them, and ordered P\_\_\_\_\_ B\_\_\_\_\_ into his car, telling the other two to keep walking or he would blow their heads off. Defendant then drove off with P\_\_\_\_\_ B\_\_\_\_\_. The Loggins girls ran home and informed the victim's boyfriend that she had been kidnapped. He called the police, who were given the license plate number of the car, which Tonya had seen and remembered, as well as its color, brown, and a description of the man's clothing.

P\_\_\_\_\_ B\_\_\_\_\_ testified that defendant drove around with her for approximately ten minutes, during which time he threatened to shoot her if she lied to him about her age. After parking in an alley, he ordered her into the back seat and told her to take off her clothes. Still holding the gun, he forced her to commit an act of oral sodomy. He then had intercourse with her, committed an act of anal sodomy, and had intercourse with her again. After these acts, defendant ordered her to dress, drove to a vacant lot, and let her out, warning her that he would shoot her if she looked back. She ran from the lot and found a police officer nearby. Within the half hour, three detectives from the Sex Crimes Unit, two men and one woman, Detective Kelly, had interviewed her about the rape.

While she was being interviewed, the officers received information that another police officer had located the brown car with the license number related by Tonya. P\_\_\_\_\_ B\_\_\_\_\_ was taken to the arrest site, where she identified defendant, who was handcuffed at the time. The Loggins girls were also brought to the site and both identified defendant. A gun was recovered at the arrest site, and the officer who arrested defendant testified that he saw him throw it under the car when he pulled him over.

Detective Kelly took P\_\_\_\_\_ B\_\_\_\_\_ to the hospital, where a sexual assault kit was prepared. Criminalist Donna Bell testified that she discovered sperm on the vaginal smears of P\_\_\_\_\_ B\_\_\_\_\_, and that seminal fluid was detected on a towel and undershorts recovered from appellant. Bell also stated that defendant's saliva sample showed him to be a non-secretor, consistent with 20% of the population. She found that P\_\_\_\_\_ B\_\_\_\_\_ was a secretor. Having analyzed the semen and sperm, she stated that her results were consistent with a theory that a non-secretor had violated P\_\_\_\_\_ B\_\_\_\_\_, or that the traces of fluid were insufficient to permit a typing.

Detective Kelly testified at trial for the defense. She stated on direct that P\_\_\_\_\_ B\_\_\_\_\_ did not tell her that she was raped twice, but that it was not unusual for a victim to say that. Defense counsel neither objected nor moved to strike the answer as unresponsive. On cross-examination, the state was permitted, over objection, to elicit testimony concerning the common tendency of rape victims to omit specific acts from their descriptions, particularly in situations where there had been multiple sex acts.

The court also admitted testimony, over objection, by Detective Edward Prenavo, who conveyed P\_\_\_\_\_ B\_\_\_\_\_ to the location where she viewed defendant, that she positively identified him.

■ In defendant's first point on appeal, he asserts that the court erred in admitting the testimony of Detective Kelly that it was not uncommon for rape victims to leave out specific acts when interviewed about such occurrences. Detective Genevieve Kelly of the St. Louis Police Department's Sex Crimes Section testified as an impeachment witness for the defense. Her interview of the victim, which took place within thirty minutes of the alleged offense, was conducted in a police car with two male officers present. On direct examination she testified that she had seen three hundred or more rape victims, that she was specifically trained to deal with rape victims, and that part of what she was trying to do was to make the rape victims comfortable. Shortly after this testimony she was asked the following:

Q. Now I'd like you to review your report, if you could, and see if there's anywhere in there where it indicates that she had told you that she had been raped twice; that is that he had put his penis in her vagina on two different occasions?

A. I've read the report over before. No, it doesn't say that but it's not unusual for a victim not to say that.

Q. Okay. But—But you wrote down everything that she told you?

A. I wrote down everything she told me at that time, yes.

Upon cross-examination, the following exchange occurred.

Q. And I believe you stated earlier it's not uncommon for rape victims to leave out specific acts?

A. That's—

MISS MARXKORS: Objection, Your Honor, to the relevance.

THE COURT: Be overruled. You may answer.

A. That's correct. Very often victims are upset and they're reluctant to talk about everything that happened. They get embarrassed and they don't want to say exactly what happened.

Q. Do you find that often in a situation where there has been multiple sex acts?

A. Yes.

Q. You do not very often hear every single act?

A. They have a very difficult time talking about something like this occurring to them shortly after.

MISS MARXKORS: Again, objection to the relevance.

THE COURT: Same ruling.

We note that although defendant objected only on the grounds of relevance at trial, in his motion for new trial and on appeal he complains that the evidence was irrelevant because Detective Kelly's statements amounted to an unqualified expert opinion on the credibility of the witness. It is well settled that a point on appeal must be based on the theory voiced in objection at trial and defendant cannot change or ex-pand on appeal the objection as made. *State v. Cannady*, 660 S.W.2d 33, 37 (Mo. App.1983). As defendant raised no point concerning Detective Kelly's expertise at trial, we disregard this argument and review only for relevancy. The trial court has broad discretion on matters of relevancy. *State v. Thompson*, 668 S.W.2d 179, 181 (Mo.App.1984). In addition, "Great latitude is allowed on cross-examination in a criminal case, ... and the trial court is invested with much discretion in determining the extent of cross-examination." (citations omitted). *State v. Lue*, 598 S.W.2d 133, 138 (Mo. banc 1980). Furthermore, a defendant is not in a position to complain of the state inquiring about matters brought into the case by his own questions. *Id.* In the case before us, defense counsel clearly brought these matters into evidence, and failed to object to Detective Kelly's answer as unresponsive on direct. Given Detective Kelly's testimony on direct that it was her job to make rape victims feel comfortable, and her other testimony that it was not unusual for victims to fail to report being raped twice, the trial court did not abuse its discretion in allowing the state's inquiry into whether rape victims often left out specific acts in their police reports due to discomfort and embarrassment. The testimony was relevant both to explain her statement regarding victims' omissions and to explain whether she was actually able to make the victims comfortable while interviewing them, which she stated was part of her job.

Defendant also complains that the testimony constitutes evidence of rape trauma syndrome and as such is inadmissible. *State v. Taylor*, 663 S.W.2d 235, 241 (Mo. banc 1984). In *Taylor*, expert testimony that the victim suffered from "rape trauma syndrome" was presented by the *state* as evidence that intercourse was not consensual. The Missouri Supreme Court held that the evidence was inadmissible and reversed. As conceded by defendant, the defense in this case is alibi, not consent, and identification, not rape, is the issue. In short, this is not a "rape trauma syndrome" case. As stated above, the trial

court committed no error in overruling defendant's objections to the admission of this testimony.

■ Defendant next challenges the admissibility of testimony by the state's expert, Criminalist Donna Bell, concerning the results of a laboratory analysis of the sperm found in the victim's vaginal smear and the seminal fluid found on defendant's undershorts and on a towel which was in his car.

The scientific test at issue is generally accepted as reliable in both the scientific and legal communities, and test results have been held admissible by Missouri courts. *State v. Young*, 668 S.W.2d 263, 265, 266. The test, as described by our court in *Young*,

> [A]llows an expert to group individuals into two categories: secretors and non-secretors. For secretors, the test determines the blood type of the assailant, as well as the victim, from such secretions as semen and saliva. Non-secretors make up twenty percent of the population and constitute an equally distinctive class whose blood type is not ascertainable from bodily secretions. *See* discussion in 12 Am.Jur. *Proof of Facts* "Identification of Seminal Fluids" § 12 at 321–22 (1961).

*Id.* at 265.

On direct examination the expert witness stated that saliva tests showed that the victim was an "O" secretor and the defendant a non-secretor. She testified that her examination of sperm found on the victim's vaginal smear, and seminal fluid found on the towel and defendant's undershorts revealed no "A", "B" or "H" antigens. This finding, she said, "would be consistent with either the presence of body fluid from a non-secretor individual or simply insufficient body fluid to be able to detect a typing." She explained that when a non-secretor had sex with another person, no evidence of the non-secretor's blood type would be found upon examination of the other person. She stated that her findings were consistent with defendant, a non-secretor, having sex with the victim. How-

ever, she testified that unlike a finger print analysis, this sort of analysis cannot indicate whether the fluid belongs to a particular person.

On cross-examination, however, Ms. Bell admitted that the results of her analysis were that the rapist was either a non-secretor or there was not enough body fluid present for a typing to show up. Either of these possibilities would be consistent with her findings. On redirect, she explained that where her results indicated that a non-secretor was involved, the alternative possibility always existed that the sample was too small to permit typing.

A fair reading of this testimony is that Ms. Bell's tests revealed that the sperm and seminal fluid came either from a non-secretor, or there was insufficient fluid available to determine the blood type of the person depositing the semen. Therefore, the test results were inconclusive.

In *State v. White*, 621 S.W.2d 287, 293 (Mo.1981), the court found that tests on semen stains "produced no identifiable blood type nor any helpful information in the investigative process but tests taken yielded only ambiguous and meaningless results." The court held that it would be of no probative value to order a co-defendant to undergo a saliva test, since the tests on the semen stains failed to establish that they were produced by either a secretor or a non-secretor. *Id.* at 294. In light of the testimony of the witness here, we conclude that the court erred in admitting this evidence.

However, error, if any, in the admission of the evidence was harmless. As the court stated in *State v. Fleming*, 577 S.W.2d 174, 177 (Mo.App.1979), "It is well-established that the admission of improper evidence is usually harmless if the fact sought to be shown is fully and properly proved by other evidence." (citation omitted). As in *Fleming*, the state presented a strong case on the rape charge, apart from the contested body fluid analysis. "Error which in a close case might call for reversal

may be disregarded as harmless where the evidence of guilt is strong." *Id.*

In defendant's third point on appeal, he submits that the court erred in admitting, over objection, the hearsay testimony of Detective Prenavo that P_____ B_____ positively identified defendant out of court. Defendant cites *State v. Degraffenreid,* 477 S.W.2d 57 (Mo. banc 1972) for the proposition that such evidence is inadmissible hearsay, and though cumulative, is nonetheless prejudicial. Although we agree that the Detective's statement was inadmissible hearsay, we do not agree that its admission was prejudicial. Our court distinguished *Degraffenreid* in *State v. Gibson,* 633 S.W.2d 101, 104 (Mo.App. 1982), stating:

> However, in *Degraffenreid,* the sole identification witness was a 78 year old man who viewed the defendant for somewhat "longer than a minute" from a distance of 78–80 feet. Under those circumstances, the officer's corroborating testimony "confirm[ed] the believability of the [witness'] testimony and thereby tip[ped] the scales against defendant." ... The facts in the present case are markedly different.... Thus, we cannot say, as the Court said in *Degraffenreid,* that Brockel's hearsay testimony "tip[ped] the scales against defendant." (citations omitted).

In Gibson, significant factors identified by the court were that two separate identifications took place; the sexual crime, rape, sensitized the victims' memories; the victims had ample opportunity to view the defendant; they picked him from a photographic lineup without hesitation; their in-court identification was unequivocal; and they were able to identify defendant's car. Similar facts exist in the case before us. Defendant suffered no prejudice through the admission of this testimony.

Defendant next contends:

> The trial court erred by overruling appellant's motion for judgment of acquittal at the close of the state's case on one count of exhibiting a weapon and by submitting both counts to a jury because appellant suffered double jeopardy by being twice convicted and sentenced for a single offense, in that the legislature intends that a single act of exhibiting a weapon "in the presence of one or more persons" be only one crime, and the evidence shows a single act of pointing a pistol in the direction of Tanya and Tonya Loggins.

In *Benton v. Maryland,* 395 U.S. 784, 793–96, 89 S.Ct. 2056, 2061–63, 23 L.Ed.2d 707 (1969), the United States Supreme Court held that the double jeopardy clause of the Fifth Amendment to the United States Constitution does apply to the states through the Fourteenth Amendment. The Fifth Amendment provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. Amend. V. This constitutional protection is composed of three distinct guarantees: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969).

Under the above doctrine, the states cannot split a single crime and prosecute it in separate parts. *State ex rel. Westfall v. Campbell,* 637 S.W.2d 94, 97 (Mo.App. 1982), citing *State v. Toombs,* 326 Mo. 981, 34 S.W.2d 61, 64 (1930).

Defendant was charged in Count VI and VII with a violation of § 571.030.1(4), RSMo Cum.Supp.1984. Count VI provided:

> The grand jurors of the City of St. Louis, State of Missouri, charge that the defendant, in the City of St. Louis, State of Missouri, on the 19th day of August, 1984, in violation of Section 571.030.1(4), RSMo, committed the class D felony of unlawful use of a weapon, punishable upon conviction under Sections 558.011.-1(4) and 560.011, RSMo, in that the defendant knowingly exhibited, in the presence of one or more persons a small revolver, a weapon readily capable of

lethal use, in an angry or threatening manner.

Count VII is identical, word for word, with Count VI. Under Instruction No. 13 the jury could have found that defendant, under Count VI, exhibited the weapon in the presence of Tonya. In Instruction No. 14, which related to Count VII, the exhibiting was in the presence of Tanya.

Reciting from respondent's brief, the pertinent evidence is as follows:

As these three neared their home, a brown car driven by the appellant pulled up alongside.... Appellant got out of his car and pointed a gun at the three girls.... Appellant ordered P_____ B_____ into his car and commanded the two Loggins girls to keep walking and not to turn around or else he would blow their heads off ....

Section 571.030.1(4), RSMo Cum. Supp.1984, provides: "A person commits the crime of unlawful use of weapons if he knowingly: ... (4) Exhibits, *in the presence of one or more persons,* any weapon readily capable of lethal use in an angry or threatening manner; ...." (emphasis ours).

It appears to us that a single act of exhibiting (in an angry or threatening manner), in the presence of however many persons, is one offense under the statute. The pointing of the weapon at a person or persons is not a necessary element of the offense. *See State v. Brewer,* 630 S.W.2d 591, 595, 596 (Mo.App.1982). Therefore, we find that defendant was charged in Count VI with exhibiting, in the presence of *one or more persons* a small revolver in an angry or threatening manner. The one or more persons included both Tonya and Tanya. In Count VII, he was charged with the same act of exhibiting.

It is our opinion that under the facts and circumstances here, defendant has committed but one offense under Section 571.030.-1(4), RSMo Cum.Supp.1984. His conviction under Count VII constitutes double jeopardy and should be reversed.

Reversed as to Count VII. Affirmed in all other respects.

DOWD, P.J., and CRIST, J., concur.